ACCEPTED
01-15-00326-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
12/21/2015 3:00:20 PM
CHRISTOPHER PRINE
CLERK

**No. 01-15-00326-CV**

IN THE COURT OF APPEALS
FIRST DISTRICT OF TEXAS
HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
12/21/2015 3:00:20 PM
CHRISTOPHER A. PRINE
Clerk

DON ABBOTT HOLMES, GAYLE EISLER HOLMES,
and the COMMUNITY PROPERTY ESTATE OF
DON ABBOTT HOLMES and GAYLE EISLER HOLMES,

Appellants,

v.

JETALL COMPANIES, INC.,

Appellee.

On Appeal from the 127th District Court
Harris County, Texas

## CORRECTED BRIEF AND APPENDIX OF APPELLANTS

Geoffrey Berg
Texas Bar No. 00793330
BERG FELDMAN JOHNSON
    BELL, LLP
4203 Montrose Blvd., Suite 150
Houston, Texas 77006
Telephone: (713) 526-0200
Gberg@bfjblaw.com

Martin J. Siegel
Texas Bar No. 18342125
LAW OFFICES OF
    MARTIN J. SIEGEL, P.C.
2222 Dunstan Road
Houston, Texas 77005
Telephone: (281) 772-4568
Martin@Siegelfirm.com

Attorneys for Appellants

*Oral Argument Requested*

## IDENTITY OF PARTIES AND COUNSEL

**Appellants:**

    Don Abbott Holmes
    Gayle Eisler Holmes

**Trial and Appellate Counsel for Appellants:**

    Christopher D. Nunnallee
    Law Offices of Christopher D. Nunnallee
    1413 Brittmoore Road
    Houston, Texas 77043

    Charles T. Kelly
    Julie Hamrick
    Kelly & Smith, P.C.
    4305 Yoakum Blvd.
    Houston, Texas 77006

    Martin J. Siegel
    Law Offices of Martin J. Siegel, P.C.
    2222 Dunstan Road
    Houston, Texas 77005

    Geoffrey Berg
    Berg Feldman Johnson Bell, LLP
    4203 Montrose Boulevard, Suite 150
    Houston, Texas 77006

**Appellee:**

    Jetall Companies, Inc.

**Trial and Appellate Counsel for Appellees:**

Mark D. Goranson
GoransonKing PLLC
550 Westcott Street, Suite 415
Houston, Texas 77007

Mike O'Brien
Mike O'Brien PC
14355 Highway 105
Washington, Texas 77880

Stephen D. Fox
2500 West Loop South, Suite 255
Houston, Texas 77027

Richard D. Howell
Buckley, White, Castaneda & Howell, L.L.P.
2401 Fountainview, Suite 1000
Houston, Texas 77057

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ................................................................. i

TABLE OF CONTENTS ................................................................................. iii

INDEX OF AUTHORITIES ............................................................................... v

STATEMENT OF THE CASE ............................................................................. x

STATEMENT REGARDING ORAL ARGUMENT ....................................................... xi

ISSUES PRESENTED .................................................................................. xii

INTRODUCTION ........................................................................................ 1

STATEMENT OF FACTS ................................................................................ 2

    I.    The Parties' Contract And Don's Efforts To Comply With It ....... 2

    II.   Jetall's Refusal To Close Unless Don And Gayle
         Lowered The Sales Price By At Least $12,000 ........................... 6

    III.  The Proceedings Below ................................................. 11

SUMMARY OF THE ARGUMENT ...................................................................... 16

ARGUMENT ............................................................................................ 18

    I.    Jetall Failed To Prove Lost Profits Damages ........................... 19

        A.    Standard Of Review ............................................. 19

        B.    Jetall Offered Legally Insufficient Evidence
            Of Lost Profits ................................................. 20

        C.    The Lost Profits Award Is Further Suspect
            Because The Jury Plucked A Figure Out
            Of Thin Air .................................................... 27

II. The District Court Erred By Disallowing A Jury Question On Whether The Holmeses' Breach Was Excused By Jetall's Prior Repudiation ........................ 30

    A. Standard Of Review ...................................................... 30

    B. Ample Evidence Supported Don And Gayle's Position That Jetall Repudiated .................... 31

PRAYER .......................................................................................... 39

CERTIFICATE OF SERVICE .............................................................. 41

CERTIFICATE OF COMPLIANCE ....................................................... 42

# INDEX OF AUTHORITIES

page

**Case**

*Builders Sand, Inc. v. Turtur,*
678 S.W.2d 115 (Tex. App. – Houston [14th Dist.] 1984) ....................... 32

*Callejo v. Brazos Elec. Power Co-op., Inc.,*
755 S.W.2d 73 (Tex. 1988) ........................................................... 27, 28

*City of Keller v. Wilson,*
168 S.W.3d 802 (Tex. 2005) ............................................................. 19

*CMA-CGM (America), Inc. v. Empire Truck Lines, Inc.,*
416 S.W.3d 495 (Tex. App. – Houston [1st Dist.] 2013, rev. denied)...... 31

*Coastal Transport Co., Inc. v. Crown Cent. Petroleum Corp.,*
136 S.W.3d 227 (Tex. 2004) ............................................ 19, 20, 26, 27

*Crown Life Ins. Co. v. Reliable Machine and Supply Co., Inc.,*
427 S.W.2d 145 (Tex. App. – Austin 1968, writ ref'd n.r.e.) ................. 36

*Cuidado Casero Home Health of El Paso, Inc. v.*
*Ayuda Home Health Care Serv., LLC,*
404 S.W.3d 737 (Tex. App. – El Paso 2013) ........................ 21, 23, 25, 26

*Cunningham v. Haroona,*
382 S.W.3d 492 (Tex. App. – Ft. Worth 2012, rev. denied)................... 15

*Dror v. Mushin,*
2013 WL 5643407 (Tex. App. – Houston [14th Dist.] 2013,
rev. denied).................................................................................. 36

*Dunham and Ross Co. v. Stevens,*
538 S.W.2d 212 (Tex. App. – Waco 1976)............................................ 32

*Elbaor v. Smith,*
845 S.W.2d 240 (Tex. 1992) .............................................................. 30

*Estrada v. Cheshire,*
  __ S.W.3d __, 2015 WL 4101195
  (Tex. App. – Houston [1st Dist.] July 7, 2015) ........................................... 19

*Examination Mgmt. Serv. v. Kersh Risk Mgmt, Inc.*,
  367 S.W.3d 835 (Tex. App. – Dallas 2012) ................................. 24, 26, 28

*E-Z Mart Stores, Inc. v. Ronald Holland's A-Plus*
*Transmission & Automotive, Inc.,*
  358 S.W.3d 665 (Tex. App. – San Antonio 2011, pet. denied)................. 18

*First Fed. Sav. & Loan Assoc. of Wilmette, Ill. v. Pardue*,
  545 F. Supp. 433 (N.D. Tex. 1982),
  *aff'd*, 703 F.2d 555 (5th Cir. 1983) ........................................................... 36

*First State Bank v. Keilman*,
  851 S.W.2d 914 (Tex. App. – Austin 1993, writ denied)......................... 27

*Great Pines Water Co. v. Liqui-BoxCorp.*,
  203 F.3d 920 (5th Cir. 2000) ..................................................................... 24

*Grp. Life and Health Ins. Co. v. Turner*,
  620 S.W.2d 670 (Tex. Civ. App. – Dallas 1981) ...................................... 31

*Gulf States Utilities v. Low*,
  79 S.W.3d 561 (Tex. 2002) ........................................................................ 27

*Hampton v. Minton*,
  785 S.W.2d 854 (Tex. App. – Austin 1990)............................................... 32

*Helena Chem. Co. v. Wilkins*,
  47 S.W.3d 486 (Tex. 2001) ........................................................................ 21

*Hernandez v. Gulf Grp. Lloyds*,
  875 S.W.2d 691 (Tex. 1994) ...................................................................... 33

*Holt Atherton Indus., Inc. v. Heine*,
  835 S.W.2d 80 (Tex. 1992) ............................................... 20, 21, 23, 24

*Humphrey v. Placid Oil Co.*,
142 F. Supp. 246 (E.D. Tex. 1956),
*aff'd*, 244 F.2d 184 (5th Cir. 1957) ................................................. 36, 37

*Hunter Bldgs. & Mfg., L.P. v. MBI Global, LLC*,
436 S.W.3d 9 (Tex. App. – Houston [14[th] Dist.] 2014, rev. denied)........ 23

*Hyundai Motor Co. v. Rodriguez*,
995 S.W.2d 661 (Tex. 1993) ....................................................... 30

*In re Interest of Doe,*
917 S.W.2d 139 (Tex. App. – Amarillo 1996, writ denied)..................... 33

*Jon-T Farms, Inc. v. Goodpasture, Inc.*,
554 S.W.2d 743 (Tex. App. – Amarillo 1977,
writ ref'd n.r.e., *disapproved on other grounds,*
McKinley v. Drozd*, 685 S.W. 2d 7 (Tex. 1985))..................................... 36

*Kellmann v. Workstation Integrations, Inc.,*
332 S.W.3d 679 (Tex. App. – Houston [14[th] Dist.] 2010) ................. 24, 27

*Knox v. Taylor*,
992 S.W.2d 40 (Tex. App. – Houston [14[th] Dist.] 1999) ........................ 29

*Lytle Lake Water Control and Imp. Dist. v. Shaw Envtl., Inc.*,
2006 WL 6863698 (N.D. Tex. 2006) ................................................. 35, 36

*M & A Technology, Inc. v. iValue Group, Inc.*,
295 S.W.3d 356 (Tex. App. – El Paso 2009, rev. denied) ................. 28, 29

*Marriage of Braddock*,
64 S.W.3d 581 (Tex. App. – Texarkana 2001) ........................................ 31

*Natural Gas Pipeline Co. of Am. v. Justiss*,
397 S.W.3d 150 (Tex. 2012) ............................................................... 20

*Phillips v. Carlton Energy Grp., LLC*,
___ S.W.3d ___, 2015 WL 2148951 (Tex. May 8, 2015)................. 21, 22

*Phillips v. Phillips*,
820 S.W.2d 785 (Tex. 1991) .................................................................... 28

*Powell Elec. Sys., Inc. v. Hewlett Packard Co.*,
356 S.W.3d 113 (Tex. App. – Houston [1st Dist.] 2011) .......................... 29

*Preston Reserve, L.L.C. v. Compass Bank*,
373 S.W.3d 652 (Tex. App. – Houston [14th Dist.] 2012) ................. 22, 29

*Rusty's Weigh Scales and Serv., Inc. v. N. Tex. Scales, Inc.*,
314 S.W.3d 105 (Tex. App. – El Paso 2010) ..................................... 23, 24

*Saenz v. Martinez*,
2008 WL 4809217 (Tex. App. – San Antonio 2008) .............................. 32

*Schroeder v. HB Assoc., LLC*,
2002 WL 1494351 (Tex. App. – Dallas 2002)
(not designated for publication)................................................................ 27

*Sewing v. Bowman*,
371 S.W.3d 321 (Tex. App. – Houston [1st Dist.] 2012,
rev. dismissed).......................................................................................... 30

*Silver Oak Custom Homes LLC v. Tredway*,
2013 WL 3522916 (Tex. App. – Houston [1st Dist.] 2013) ..................... 15

*State v. Hufstutler*,
871 S.W.2d 955 (Tex. App. – Austin 1994)............................................. 29

*State ex rel D.L.S.*,
446 S.W.3d 506 (Tex. App. – El Paso 2014) .......................................... 18

*Stevens v. Nat'l Education Ctrs.*,
11 S.W.3d 185 (Tex. 2000) (Mem. Op.) ................................................. 31

*Superior Broadcast Prod.v. Doud Media Grp., LLC*,
392 S.W.3d 198 (Tex. App. – Eastland 2012)......................................... 25

*Szczepanik v. First So. Trust Co.*,
883 S.W.2d 648 (Tex. 1994) .............................................................. 21, 25

*Tabrizi v. Daz-Rez Corp.*,
153 S.W.3d 63 (Tex. App. – San Antonio 2004) ..................................... 27

*Taylor v. Trans-Continental Properties, Ltd.*,
739 S.W.2d 873 (Tex. App. – Tyler 1987)............................................... 22

*Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*,
877 S.W.2d 276 (Tex. 1994) ................................................................... 21

*U.S. Tire-Tech, Inc. v. Boeran, B.V.*,
110 S.W.3d 194 (Tex. App. – Houston [1st Dist.] 2003,
rev. denied) ............................................................................................. 30

**Rules**

TEX. R. CIV. P. 278 ........................................................................................ 30

TEX. R. EVID. 401 .......................................................................................... 20

## STATEMENT OF THE CASE

*Nature of the case*:  This is a suit for breach of contract.  CR 6-12.[1]

*Trial court and Judge:*  District Court No. 127, Harris County, Texas; Hon. Ravi Sandill.

*Course of Proceedings and Disposition in the trial court:*  The case was tried to a jury, which awarded Appellee $975,000 in damages as well as attorneys' fees.  App. Tab 1 (CR 302-16).  The trial court entered judgment on the verdict on January 22, 2015, and later denied Appellants' post-trial motions.  *Id.* (CR 300-01), CR 338).

---

[1]  "CR __" refers to a specific page number in the clerk's record.  "SCR" refers to the supplemental clerk's record requested on July 30, 2015. "RR __/___" refers to a specific volume and page number in the reporter's record.  "App. Tab __" refers to a specific tab in Appellants' Appendix.

## STATEMENT REGARDING ORAL ARGUMENT

The Court should hear argument in this appeal. Although the legal principles are familiar, the facts are somewhat complex, involving a failed real estate transaction. Moreover, one issue involves whether Appellee is entitled to a substantial award of lost profits from Appellants, two individuals, and the Court has traditionally applied a rigorous, fact-intensive review of such awards. Hence, Appellants respectfully submit that the Court would benefit from an in-person exploration of the issues at stake in this appeal with counsel for the parties.

# ISSUES PRESENTED

1. A jury awarded $900,000 in lost profits to a developer who was unable to acquire property needed to build two new townhomes, but the developer offered no evidence at all of the applicable real estate market or comparable sales, and could only roughly estimate what the townhomes would cost to build. An award of lost profits requires objective and detailed facts and figures in support, and cannot be speculative. Should the award be reversed?

2. Before closing, the developer said it would withhold at least $12,000 from the property's $450,000 purchase price because the seller supposedly failed to perform certain minor terms of the sales contract. There was evidence, however, that this was unjustified and that the developer simply wanted to pay less for the land. Should the jury have been asked whether the seller's breach in failing to close the sale was excused by the developer's prior refusal to pay the full sales price?

## INTRODUCTION

Appellant Don Holmes signed a contract to sell a vacant lot he and his wife Gayle owned in a residential neighborhood in Houston to Appellee Jetall Companies for $450,000, but the sale never closed. Jetall sued for breach and the jury awarded $900,000 for profits supposedly lost when Jetall was unable to build and sell two townhomes on the property.

The Court should reverse the lost profits award for legal insufficiency because the sole evidence propping it up – brief testimony from Ali Choudhri, a principal in Jetall – falls far short of the exacting requirements for proving lost profits. Choudhri did not testify about the market for homes in the applicable neighborhood, comparable sales, what he planned to charge for the townhomes, why he believed he could sell them and for what, and so on. Nor did he provide precise and detailed figures about costs, making it impossible to calculate lost profits with any specificity. Instead, Choudhri just baldly asserted that Jetall would have netted $1.2 million on the project, and introduced no corroborating facts, figures or data. To make matters worse, the jury arbitrarily awarded $900,000 – a sum never mentioned at trial and 25% less than what Choudhri testified to – for no discernible reason in the record. Choudhri's *ipse dixit* is legally insufficient evidence of lost profits, and this portion of the award should be reversed.

1

Reversal is also required by the district court's refusal to submit a question on whether Jetall's prior repudiation or anticipatory breach of the contract excused Don and Gayle's breach. Don testified that Choudhri said Jetall would not pay the full $450,000 purchase price at closing but would instead withhold $12,000 or $15,000. This was ostensibly to compensate Jetall for what Choudhri claimed was Don's failure to perform certain minor provisions of the contract, such as the duty to replat the property into two separate lots. But a jury could find that Jetall had no rightful basis to pay less than the full sales price, and that Choudhri's expressed reason for doing so was simply a pretext to obtain the property more cheaply. In that event, Choudhri's insistence on paying less than $450,000 at closing was a breach or repudiation of the contract, and Don and Gayle were entitled to a question on whether it excused their own failure to close the sale. This error calls for reversal and a new trial.

## STATEMENT OF FACTS

### I. The Parties' Contract And Don's Efforts To Comply With It

Don and Gayle own a vacant lot at 1204 Banks Street in Houston as community property. RR 2/206. In 2011, they decided to sell the property, initially posting a "for sale by owner" sign on the lot and later exploring a potential partnership with a friend and developer, Robert Davis, to build

2

townhouses there.  RR 2/216-17, 265.  Don and Gayle never entered into a formal agreement with Davis, however, and nothing came of the idea.  RR 2/265-66.

Choudhri is a principal in Jetall Companies, a property development and management firm.  RR 3/25-29.  After seeing a "for sale" sign on the Holmeses' lot, he inquired about buying it and contacted Don.  RR 3/33-40. They met in Jetall's offices on October 28, 2011, and Choudhri told Don that he was interested in building and selling two townhomes on the property. RR 3/32.  Don agreed to sell the lot to Jetall for $450,000, and they executed a form contract memorializing the sale.  RR 3/40-42, 54; App. Tab 2 (Pl. Exh. 1).

In addition to its form terms, the sales contract contains five "special provisions" added to the document by Choudhri during the meeting.   App. Tab 2 (Pl. Exh. 1, ¶ 11); RR 3/43-44.  Four of these were warranties that the property (i) is unrestricted and has no positive or negative easements, (ii) is not on a fault line, (iii) is "environmentally clean," and (iv) has no height restrictions.  *Id*.  The other special condition states: "Seller to provide replatting with elec. survey and soil test report."  *Id.*  Closing was to occur within thirty business days of the title commitment.  *Id*., ( Pl. Exh. 1 ¶ 9).

After Don signed the contract, Choudhri gave him an earnest money check payable to Declaration Title Company for $10,000, which the title company later picked up from him along with the contract. RR 2/224-25, RR 3/54-55, Pl. Exh. 2. The following week, Choudhri transferred $450,000 to the title company in order to facilitate a quick closing, which Don preferred in light of certain financial problems he was having. RR 3/43, 67-68; RR 2/245-46; Pl. Exh. 14.

Don emailed Choudhri a soil report for the property, completed in 1997, a few days after their meeting. Pl. Exh. 10. Although the contract didn't require a soil report of any particular age, App. Tab 2 (Pl. Exh. 1 ¶ 11), Choudhri testified that Don told him at their meeting that the report he would deliver was only two years old. RR 3/65-66. Choudhri called Don and they discussed obtaining a new report. RR 3/66-67. But Don later called the company that had performed the 1997 report and was told a new one was unnecessary because soil conditions hadn't changed on the property. RR 2/269, RR 4/95-96.

At his October 28 meeting with Choudhri, Don offered to provide an existing survey he had of 1204 Banks Street. RR 2/270. The following week, he emailed it in electronic form to the title company but the company lacked the software to open it. RR 2/257, RR 4/95. Because the survey

4

dated to 1998, it did not reflect a replatting of the property. RR 3/73, 184. The title company also objected that the survey's failure to show the lot as vacant precluded using it for closing. RR 3/72-73, Pl. Exh. 11. Don therefore inquired whether a new survey was necessary, and later emailed stating that he assumed the title company would order a new one if needed. Pl. Exh. 13, Pl. Exh. 15, RR 2/257-58. He had previously closed the sale of a different property using a fifteen year-old survey and so assumed that sale of the Banks Street lot could proceed using his 1998 survey. RR 2/257-58.

Don had done most of the work to compete the replatting of the property, incurring $3,000 in cost, before he entered into the contract with Jetall because he had previously explored dividing the lot in order to build townhouses. RR 2/254-56, RR 4/100-01. All that remained was to pay a $525 fee to the City of Houston and file an application to record the replatting. RR 2/254-56, 271-72. At their meeting, Don told Choudhri that he would not finalize the replatting before closing because, if the sale fell through, a replatting would prevent the Holmeses or another buyer from doing something different with the property, such as building a single family

home or more than two townhouses.  *Id*., RR 4/100-01.  Don testified that Choudhri told him this was fine.  RR 2/271-72, 255.[2]

## II. Jetall's Refusal To Close Unless Don And Gayle Lowered The Sales Price By At Least $12,000

In the weeks following their execution of the contract, Don and Choudhri spoke and emailed about closing the sale and what Choudhri believed Don still had to do to fulfill the contract's special provisions.  RR 3/72-74, Pl. Exh. 13-18.  On November 15, the title company obtained a new survey of the property at Don's direction and emailed it to Choudhri, adding: "The seller is ready to close do you want to do this on Wednesday, Thursday or Friday of this week."  Pl. Exh. 18, 19.

Rather than close, however, Choudhri demanded that Don complete the replatting of the property.  Pl. Exh. 20; RR 3/74-75, 82-83.  Frustrated by what he believed were Choudhri's new demands, Don emailed Choudhri on November 18, writing:

Ali

I am not sure what is going on.  When we were working on an agreement I told you I had an old electronic survey but that would be an advantage for your designer.  Additionally we discussed that I had started getting the lot replated [*sic*] but that

---

[2]    There was also testimony at trial that the Holmes lot may have had an easement toward the back of the property in violation of the seller's warranty of no easements, but Choudhri confirmed that this was not a material concern.  RR 3/220.

6

had not been filed so it would not impact your desire to build a single family home on the lot. Thirdly, I offered a soil test that I had performed a few years ago to you. After you later refused to accept the electronic survey, I had a new survey done which showed the lot as vacant and undivided. Now I am told you want the lot replated [*sic*], which is new, and that the soil surveys are old, which was known. I assume you are having buyers [*sic*] remorse and wish that you had purchased the other lot you were considering. I certainly have no interest in trying to sell something to someone that doesn't want it so I think it is probably best that we just back away and you can pursue the other location.

Pl. Exh. 21. Don also called the title company and learned for the first time that Choudhri had instructed the company to deduct $12,000 from the price to be paid at closing. RR 4/96.

On December 12, Choudhri emailed and hand-delivered a letter to Don stating that Jetall "looks forward" to closing the sale on December 15. Pl. Exh. 24. The letter asserted that Don had not replatted the property or provided an electronic survey or soil report; demanded performance of these tasks; and indicated that Jetall "is entitled to specific performance as well as other relief under law, such as damages and attorney's fees" for Don's supposed noncompliance. *Id*. "Notwithstanding the forgoing," however, the letter stated that Jetall would attend the closing on December 15 while reserving its rights under the contract. *Id*.

The next day, Choudhri emailed Don with a similar message, asking "please let me know if you intend to honor the contract and all terms we

7

entered into?" Pl. Exh. 23. The email asked whether Don would provide a completed replatting, electronic survey, and soil report – or if not, "will you offset the costs for me off the sales price?" *Id*. Choudhri asserted that "[t]he estimated costs" for these items "is at least $12,000 plus the time and carrying costs of doing do [*sic*]." The email concluded:

> If you need more time to complete these items I am amenable to extended [*sic*] the contract to allow you to complete. Alternatively, I am willing to accommodate you and close and fund the transaction December 15, 2011 as long as you credit me at least $12,000 for the cost of accomplishing these items at closing.
>
> I am trying my best to resolve this matter at hand before it is escalated.
>
> Please reply by 10:00 am December 14, 2011.

*Id*. Although Choudhri wrote that the soil report, replatting, and survey cost "at least $12,000," he later acknowledged that he did not actually know the exact price of performing these tasks. RR 4/61-62.

Don went to Jetall's offices to meet with Choudhri on December 13 in an effort "to resolve the issues and close." RR 3/6. According to Don, Choudhri told him during this meeting that he would close on the sale but would deduct $15,000 or $12,000 from the $450,000 purchase price in order to complete the disputed items Choudhri claimed had not been performed. RR 2/272-73; RR 3/11, 23; RR 4/102-03. As Don testified:

8

What happened, on Tuesday the 13th, I went by his office in an attempt to negotiate some kind of settlement that we could conclude the transaction and at that point in time we discussed – you know, I told him that I wasn't going to pay more for the items that he wanted to charge me. I think that during the day he said $15,000 but I see that he was back down to $12,000, but the amount kind of varied.

But he was going to take off for these items and I said that I had given him what I promised and that was what I had already developed or what I had already purchased and all I was giving him was old documents. I didn't – had never agreed to any of the new ones and that if we were going to close, that I wanted the full amount. And he told me that he was losing money by not being able to move ahead and that he was going to sue me and if I didn't close immediately, I better get a lawyer. And this was the most threatening he had been and I had just gone to his office trying to resolve it.

RR 4/102-03. A title company employee also told Don that $15,000 of the price would be placed in escrow, and Choudhri told Don that Don would be unable to access these funds until Choudhri "fe[lt] like it." RR 2/272-73.

Gayle objected to the special provisions in the contract and to consummating the deal under the agreement Don signed. RR 2/274, RR 3/7, RR 4/77-79. Nonetheless, they were ready to close on December 13 and would have willingly done so but for Choudhri's demand to lower the purchase price. RR 4/106, RR 3/11. They also feared "that even if we conceded the $15,000, that he was going to come back again on other – on the other points. It was just going to be an ongoing dilemma of trying to get money from him." RR 2/274.

9

Choudhri gave a different account of the parties' December 13 meeting, testifying that Don asked to increase the sales price and that the discussion ended when Choudhri told him "We have a deal" and that he was "not even going to entertain" a higher price. RR 3/97. Choudhri testified that, in fact, Jetall would have closed the sale on December 15 without further action by the Holmeses, and without deducting anything from the $450,000 sales price. RR 3/98-105, RR 4/64-65. He denied demanding anything from Don. RR 4/64. As Choudhri put it: "to get the deal closed, he [Don] didn't even have to do anything more under my letter to him. He just had to come and sign and close… Sign the deed and take his funds and it was our reservation if we wanted to go after him later and we wouldn't have." RR 3/98-99, 127, 185-86. Still, Choudhri acknowledged that he never told Don he would not sue for alleged breach of the special provisions after the sale closed. RR 3/181-82.

On December 14, Don emailed Choudhri in response to Choudhri's December 13 email and communicated that he had an appointment with his lawyer that morning and that he still "would like to work this out and [g]et the deal done but I do need to talk to my attorney before going forward." Pl. Exh. 25. A week later, Jetall's lawyer wrote Don demanding that the Holmeses close by December 31. Pl. Exh. 29. The letter reprised the claim

10

that Don was obligated to comply with the special provisions but stated that, if he chose not to, Jetall "would be willing" to deduct their cost from them at closing, and that the cost was estimated to be $12,000. *Id.* The letter warned that Jetall would file suit if no closing occurred and invited Don to request a copy of Jetall's draft petition (though one was actually included with the letter). *Id.*, RR 4/81.

On January 5, Don's attorney wrote Jetall's lawyer and agreed to close the sale if the original contract was declared null and void and the parties released each other from any liabilities under it, if the purchase price was increased to $456,000, and if Jetall paid outstanding ad valorem taxes on the property. Pl. Exh. 30. The Holmeses increased the purchase price by $6,000 in this offer to cover fees they had to pay their attorney while dealing with Jetall. RR 3/10-11. The parties then stopped negotiating, and the sale was never completed.

### III.   The Proceedings Below

Jetall sued Don and Gayle and their community property estate for breach of contract and fraud, seeking damages and specific performance. CR 6-12. The case eventually proceeded to a jury trial.

At trial, Choudhri argued that he had wanted to close the sale on December 15 and would not have deducted any funds from the purchase

11

price at closing. RR 3/95-105. As for damages, Choudhri testified as Jetall's expert witness on the topic. CR 17, RR 5/9. He claimed that the profit Jetall would have reaped on the sale of the two townhomes planned for the lot "would have been in excess of $1.2 million." RR 3/122. Jetall offered an exhibit (Exhibit 36) its counsel called a "pro forma" for the project, including "calculations of the cost, expenses… [and] profitability" of the planned development, but the document was never admitted. RR 3/115-17, 133-34. On cross-examination, Choudhri gave the following testimony about what it would cost to build the townhomes:

Q. And you previously told me it would have cost you approximately $850,000 in cost to build those homes, correct?

A. I don't recall what I told you, but if – the numbers are about $800,000 per home. If you're saying it's 850, I know my depo was about a year ago; so I don't know if I – I can't recall exactly, but close, yes sir.

Q. North of $800,000 it was going to cost you to build these homes, correct?

A. Yes.

RR 3/125-26. Other than that, Jetall offered no evidence about expenses connected to the project. RR 3/115-26.

Choudhri did not testify about how long construction would take, when the homes would be for sale, what the real estate market was like then,

12

what other comparable townhomes near 1204 Banks Street were selling for, or any other data about Jetall's planned development. *Id*. He testified generally that buyers were interested in Jetall's homes, RR 3/29-32, 84, and he stated that his sister initially wanted one of the townhouses planned on the Holmes lot. RR 3/32. But Choudhri gave no more no more specific information about the likelihood of selling the townhomes, what he planned to charge for them, how many buyers might be available, what and whether they could pay, and so forth. RR 3/115-26. In addition to lost profits, Jetall sought to recover the claimed rise in the value of the land. RR 4/163-64.

Don and Gayle defended against Jetall's claim for breach by arguing that the company breached first when Choudhri told Don that Jetall would withhold $12,000 or $15,000 from the purchase price under the pretext that Don failed to complete the special provisions. RR 2/192-93. Gayle, represented by separate counsel, also defended by arguing that she never signed the contract or ratified it, that Don did not act as her agent in the transaction, and that the contract was therefore void given Don's incapacity to sell their community property on his own. RR 2/186-87, 192. Thus, much of the trial testimony concerned whether Gayle intended to enter into the contract with Jetall and authorized Don to act for her. The Holmeses

13

also argued that Choudhri failed to substantiate Jetall's damages for lost profits. RR 4/181.

The parties began discussing the charge before testimony concluded on the last day of trial. The district court indicated that he would find that Jetall waived performance of the special provisions as a matter of law, but that Jetall could not have committed breach because Choudhri had previously transferred the purchase price to the title company. RR 4/4-10. "So once the 450 is at the title company," the court stated, "he can't breach." RR 4/9. When Gayle's counsel objected that Choudhri had instructed the title company to withhold part of the sales proceeds due to Don's supposed failure to have completed the replatting process, the court responded: "There's no evidence of that," and added: "The issue in this case is at the time of closing was the land conveyed. Nothing else matters." RR 4/12-13.

At the charge conference later that day, Don and Gayle's counsel requested a question on whether their breach was excused by Jetall's prior anticipatory breach, that is, Choudhri's stated intention to withhold at least $12,000 from the purchase price to compensate for supposed non-performance of the special provisions. RR 4/118-120, 127; SCR (Jury Question No. 4). Consistent with its earlier comments, the court refused, finding that there was no fact question on the issue and that, as a matter of

14

law, the Holmeses breached the contract but Jetall did not. RR 4/119, 127, 131.[3] As a result, the charge did not include questions on whether either party breached or whether any breach by Don and Gayle was excused by Jetall's prior anticipatory breach or repudiation. App. Tab 1 (CR 306-16).

The jury found that Gayle authorized Don to enter into the contract, and that the Holmeses did not commit fraud. *Id*. It awarded $75,000 in breach of contract damages for the difference in the value of the property, and $900,000 in damages for Jetall's lost profits. *Id*. (CR 308). The jury also awarded Jetall $52,800 in attorneys' fees through trial, and additional fees if the company prevails on appeal. *Id*. (CR 314). The court later entered judgment on the jury's verdict. *Id*. (CR 300-01).

Don and Gayle timely moved for a new trial, to disregard the jury's findings, and for judgment notwithstanding the verdict based on the trial

---

[3] In later colloquy, the court stated that Gayle could not request an anticipatory breach question while also asking the jury to decide whether Don was authorized to agree to the sale on her behalf. RR 4/129-30. The court evidently thought that an anticipatory breach question would mean Gayle was "admitting that she's party to the contract," thus conceding the authority issue. RR 4/130. In fact, parties may place alternative theories before the jury. *See Silver Oak Custom Homes LLC v. Tredway*, 2013 WL 3522916 at * 5 (Tex. App. – Houston [1st Dist.] 2013). Faced with this erroneous ruling and the unnecessary choice imposed by the court, Gayle indicated she was withdrawing her request for an anticipatory breach question. RR 4/130. Nevertheless, her earlier objection notified the court of the issue and thereby preserved the point for appellate review. *See, e.g., Cunningham v. Haroona*, 382 S.W.3d 492, 510 (Tex. App. – Ft. Worth 2012, rev. denied) ("The trial court clearly understood [plaintiff's] complaint, and this is all that was required").

court's refusal to submit a question on breach and excused performance and the lack of evidence of lost profits. CR 317-26. At the hearing on the motion, the court reiterated: "I found as a matter of law that there was a breach" by Don and Gayle. RR 5/4. On the issue of lost profits, the court dismissed the Holmeses' argument that, among other failings, Choudhri never testified to the cost of building the townhomes by stating: "Everyone knows, I mean, you go to a builder today, they'll build you a house for $150 a square foot. They'll tell you that, correct?" RR 5/7. Jetall defended Choudhri's testimony on the basis that he was qualified as an expert to opine on the topic. RR 5/9. The court denied the motion. CR 338.

## SUMMARY OF ARGUMENT

First, there is legally insufficient evidence of Jetall's lost profits. Choudhri testified that the failure to acquire the land and build and sell two townhouses cost Jetall $1.2 million in profits, but little besides his *ipse dixit* supports the claim. Choudhri did not testify at all about the relevant real estate market at the relevant time. The record is silent on comparable sales near 1204 Banks at whatever time Jetall expected to finish the project (Choudhri didn't say), what Jetall intended to charge for the townhomes, whether sales could have been achieved and why, what buyers might have paid, and so forth. Without this kind of basic evidence, Jetall's claim is

16

entirely speculative. Moreover, claims for lost profits must be supported by objective and detailed facts, figures and data, but Jetall introduced none of this. Choudhri gave only a rough estimate of what building the homes would cost, but the lack of specificity makes it impossible to tally Jetall's damages with any precision. On top of all that, the jury ignored Jetall's evidence and its request for $1.2 million and randomly awarded only $900,000, though no evidence at all supports this figure and it was never mentioned by anyone at trial. Given the lack of any evidentiary basis for the jury's award, it should be reversed. *See* Point I, *infra*.

Second, the Court should reverse the judgment because the trial court erred in declining to submit a question on whether Jetall's prior repudiation or anticipatory breach of the contract excused Don and Gayle's breach. Choudhri told Don that Jetall would withhold $12,000 or $15,000 from the purchase price at closing. Title company employees in communication with Choudhri said the same thing. Choudhri's reason for this was Don's claimed nonperformance of the special provisions, but a jury could find that this was just an excuse to pay less for the lot. The trial court decided that Jetall waived performance of the special provisions as a matter of law, and a jury could have found that they were non-material. Moreover, Don performed these terms adequately, and no evidence in the record supports the claim that

17

Jetall would have incurred as much as $12,000 or $15,000 to take care of them after closing. As a result, a jury could have determined that Jetall's insistence on withholding such a substantial portion of the sales price was an anticipatory breach or repudiation of the contract that excused the Holmeses' later failure to close the sale, and the court consequently should have included a question on this issue in the charge. Its failure to do so mandates reversal. *See* Point II, *infra*.

## ARGUMENT

Don and Gayle urge reversal on two grounds: insufficiency of the evidence supporting lost profits damages, and the trial court's erroneous failure to include a question for the jury on whether the Holmeses' breach of contract was excused. Because the legal insufficiency point would require rendition and should therefore be decided first, it is addressed first in this brief. *See State ex rel D.L.S.*, 446 S.W.3d 506, 519 (Tex. App. – El Paso 2014) ("Where the finding is legally insufficient, reversal and rendition are the proper remedies"); *E-Z Mart Stores, Inc. v. Ronald Holland's A-Plus Transmission & Automotive, Inc.,* 358 S.W.3d 665, 670 (Tex. App. – San Antonio 2011, pet. denied) ("Because legal sufficiency is a rendition issue, we must address it before addressing issues that would require a remand").

## I. Jetall Failed To Prove Lost Profits Damages

### A. Standard Of Review

A jury's finding is legally insufficient and must be reversed "if the record shows: (1) that a vital fact is completely absent; (2) that the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is not more than a scintilla; or (4) that the evidence establishes conclusively the opposite of the vital fact." *Estrada v. Cheshire*, __ S.W.3d __, 2015 WL 4101195 at * 6 (Tex. App. – Houston [1st Dist.] July 7, 2015) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005)). The Court should consider the evidence in the light most favorable to the finding under review and indulge all reasonable inferences that would support the finding. *See City of Keller,* 168 S.W.3d at 822.

Findings supported only by conclusory expert or lay opinion testimony must also be reversed. "[A]lthough expert opinion testimony often provides valuable evidence in a case, it is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Coastal Transport Co., Inc. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 232 (Tex. 2004) (quotation

omitted).  Thus:

> Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact "more probable or less probable." *See* TEX. R. EVID. 401.  This Court has labeled such testimony as "incompetent evidence," and has often held that such conclusory testimony cannot support a judgment. Furthermore, this Court has held that such conclusory statements cannot support a judgment even when no objection was made to the statements at trial.

*Id.* (citations omitted).  The Supreme Court has specifically singled out lost profits testimony by business owners as the sort of opinion or quasi-expert testimony governed by this rule.  *See Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 157 (Tex. 2012) ("We have also recognized that a business owner's conclusory or speculative testimony of lost profits will not support a judgment," citing *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992)).

### B. Jetall Offered Legally Insufficient Evidence Of Lost Profits

Jetall's sole evidence of lost profits consisted of brief testimony from Choudhri.  The company also offered a document supposedly detailing "calculations of the cost, expenses… [and] profitability" of the townhomes, but it was not admitted.  RR 3/115-17, 133-34.  Because Choudhri's testimony on this subject was purely speculative and self-serving rather than a factual account rooted in objective data, that portion of the award must be

20

reversed.

Lost profits must be shown with "reasonable certainty." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 505 (Tex. 2001). "As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Phillips v. Carlton Energy Grp., LLC*, ___ S.W.3d ___, 2015 WL 2148951 at * 10 (Tex. May 8, 2015) (quoting *Holt Atherton Indus.*, 835 S.W.2d at 84). Moreover, "[t]he record must show how the lost profits were calculated." *Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Serv., LLC*, 404 S.W.3d 737, 744 (Tex. App. – El Paso 2013); *see also Szczepanik v. First So. Trust Co.*, 883 S.W.2d 648, 650 (Tex. 1994) ("There is nothing in the record to show how FST determined the amount of lost profits"). "Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions… cannot be recovered." *Phillips*, 2015 WL 2148951 at * 10 (quoting *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex. 1994)).

In this case, Jetall's scant evidence of lost profits is both speculative and lacking the objective data needed to justify an award. The claim is speculative because Choudhri provided no information at all about the real estate market in Houston at the time he would supposedly be selling the

21

townhomes he planned to build. RR 3/115-24. In fact, he did not even say when he expected to complete any sale of the townhomes – that is, how long it would take to construct them, how long they might be on the market, and how long it would take to complete a sale. Nor did Jetall introduce evidence of what other similar homes near 1204 Banks Street sold for at any time, let alone at or near the time he expected to offer the townhomes on the Holmes lot for sale.

Obviously, the market for real estate fluctuates based on a wide variety of factors. *See, e.g., Preston Reserve, L.L.C. v. Compass Bank*, 373 S.W.3d 652, 667 (Tex. App. – Houston [14th Dist.] 2012); *Taylor v. Trans-Continental Properties, Ltd.*, 739 S.W.2d 873, 881 (Tex. App. – Tyler 1987). Conditions in the market may be "uncertain or changing," *Phillips*, 2015 WL 2148951 at * 10, in light of the wider economy, the dynamics of a particular neighborhood, the level of supply, and many other considerations. Neither a robust nor an anemic market can simply be assumed by the parties or the factfinder. Without knowing the condition or specifics of the relevant market at the relevant time, it is impossible to know if the townhomes likely would have sold, or for how much. Claiming that a sale would have generated $1.2 million in profits is therefore entirely speculative.

Choudhri did generically refer to having unspecified "buyers" for the

22

townhomes. RR 3/29-32, 84. He identified one of these as his sister, though she later became uninterested in the project and it is unclear if she would have paid the market rate as a buyer when her family's own company was the seller. CR 2/32. Again, Choudhri did not say. *Id*. No other potential buyer was named. Yet "[t]he bare assertion that contracts were lost does not demonstrate a reasonably certain, objective determination of lost profits." *Hunter Bldgs. & Mfg., L.P. v. MBI Global, LLC*, 436 S.W.3d 9, 17 (Tex. App. – Houston [14th Dist.] 2014, rev. denied); *accord Holt Atherton Indus.*, 835 S.W.2d at 85; *Cuidado Casero Home Health*, 404 S.W.3d 744. Lost profits must be non-speculative *and corroborated*." *Cuidado Casero Home Health*, 404 S.W.3d 745 (emphasis added); *accord Rusty's Weigh Scales and Serv., Inc. v. N. Tex. Scales, Inc.*, 314 S.W.3d 105, 111 (Tex. App. – El Paso 2010). It is insufficient to assert baldly that buyers or customers were lost without providing corroborative detail and proof, such as the buyers' identities, evidence that they had firmly agreed to buy, proof that their loss or cancellation is the defendant's fault rather than the result of other market forces, information about the transactions that had to be cancelled (such as pricing), and so on.

For example, a company seeking $2 million in lost profits due to a former employee's theft of trade secrets asserted that the theft led to a loss of

buyers, but it failed to offer proof that it had actual contracts lined up or that customers hadn't switched for other reasons. *See Rusty's Weigh Scales*, 314 S.W.3d at 111. The mere assertion that unspecified customers defected was not enough. *See id.* Likewise, in *Great Pines Water Co. v. Liqui-BoxCorp.*, a business owner testified that a supplier's malfunctioning equipment resulted in 4,000 lost customers based on his observations of the company's plant, talking to the company's drivers, and "conversations with an unknown number of customers who complained." 203 F.3d 920, 923 (5th Cir. 2000). But the lack of hard proof that 4,000 customers actually discontinued service and why doomed any claim for lost profits. *See id.* For the same reasons, Choudhri's blanket, uncorroborated statement that he had buyers for the townhomes cannot, without more, justify an award of lost profits.

Jetall's bid for $1.2 million in lost profits is not only speculative, it lacks the necessary supporting, "objective facts, figures, or data." *Holt Atherton Indus.*, 835 S.W.2d at 84. Plaintiffs seeking lost profits must detail the expenses of the work or project they claim would have yielded the profit. *See Examination Mgmt. Serv. v. Kersh Risk Mgmt, Inc.*, 367 S.W.3d 835, 843 (Tex. App. – Dallas 2012) (faulting plaintiff's failure to "enumerate costs"); *Kellmann v. Workstation Integrations, Inc.,* 332 S.W.3d 679, 685-86 (Tex. App. – Houston [14[th] Dist.] 2010). Yet Choudhri barely referred to

24

expenses at all. He ignored the subject entirely during his direct testimony. RR 2/115-24. Questioned in cross examination about the costs of building the townhomes, he stated that "the numbers are about $800,000 per home," then agreed that it was actually "close" to $850,000 (the figure he gave in his deposition), then agreed it was "north of $800,000." RR 2/125-26. He provided no supporting detail or back-up documentation at all, such as evidence showing what specific items in the budgets for construction and marketing would have cost. "Rough estimates" cannot support recovery, but Choudhri offered nothing more. *Superior Broadcast Prod.v. Doud Media Grp., LLC*, 392 S.W.3d 198, 212 (Tex. App. – Eastland 2012).

It is impossible to determine precisely "how [Jetall's] lost profits were calculated" in the absence of specific, exact evidence of expenses. *Cuidado Casero*, 404 S.W.3d at 744; *Szczepanik*, 883 S.W.2d at 650. The trial court appears to have let Jetall off the hook on this score because "[e]veryone knows, I mean, you go to a builder today, they'll build you a house for $150 a square foot." RR 5/7. But presumed common knowledge about building costs is no substitute for actual, admitted evidence a fact-finder could properly have used to calculate the profits Jetall claims to have lost.

Equally problematic, Choudhri never testified to what he would charge for the townhouses. When Jetall designated him as an expert witness,

it stated that "[e]ach townhouse would have sold for at least $400,000."  CR 18.  But if it cost $800,000 or $850,000 to build each townhome, Jetall would have *lost* approximately $400,000 on each and earned no profit at all with anything close to a $400,000 sales price.  How and why these figures changed radically between Choudhri's expert designation and trial, such that Choudhri claimed the company would have made $1.2 million, is a mystery.

Lacking concrete and objective facts and figures, all that remains are Choudhri's qualifications and his "take my word for it" figure of $1.2 million.  Don and Gayle have never questioned that, given his experience in real estate development, Choudhri could opine on Jetall's lost profits.  RR 5/9.  But what matters is the *basis* of his opinion, not his "qualifications or his bare opinions alone… [A] claim will not stand or fall on the mere *ipse dixit* of a credentialed witness."  *Coastal Transport*, 136 S.W.3d at 232. Choudhri testified at length about his credentials, RR 2/117-19, but he failed to go much beyond his background as a developer and adequately support his opinion about this specific project.  Courts have repeatedly reversed lost profits awards based on nothing more than an expert's or business owner's say so – cases where the plaintiff's witness testified to a net amount but failed to provide detailed supporting evidence.  *See, e.g., Cuidado Casero,* 404 S.W.3d at 745-46; *Examination Mgmt. Serv.*, 367 S.W.3d at 839-44;

*Tabrizi v. Daz-Rez Corp.*, 153 S.W.3d 63, 68 (Tex. App. – San Antonio 2004); *Schroeder v. HB Assoc., LLC*, 2002 WL 1494351 at * 3 (Tex. App. – Dallas 2002) (not designated for publication). This case is no different, and Choudhri's conclusory opinion testimony is "incompetent evidence" that cannot justify the jury's award. *Coastal Transport*, 136 S.W.3d at 232.

"When a review of the surrounding circumstances establishes that the profits are not reasonably certain, there is no evidence to support the lost profits award." *Kellmann*, 332 S.W.3d at 684. The Court should therefore reverse the $900,000 award.

### C. The Lost Profits Award Is Further Suspect Because The Jury Plucked A Figure Out Of Thin Air

The jury's decision to award $900,000 in lost profits – when Choudhri testified that the sum was actually $1.2 million – further illustrates its legal insufficiency.

"In determining damages, the jury has discretion to award damages within the range of evidence presented at trial." *Gulf States Utilities v. Low*, 79 S.W.3d 561, 566 (Tex. 2002). But jurors may not "arbitrarily assess an amount neither authorized nor supported by the evidence presented at trial. In other words, a jury may not 'pull figures out of a hat'; a rational basis for calculation must exist." *First State Bank v. Keilman*, 851 S.W.2d 914, 930 (Tex. App. – Austin 1993, writ denied); *accord Callejo v. Brazos Elec.*

*Power Co-op., Inc.*, 755 S.W.2d 73, 75 (Tex. 1988) (jurors may not "leap entirely outside of the evidence" and award a sum unsupported by proof). This rule is particularly apt in breach of contract cases, where damages should neither exceed nor understate the loss. *See Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) ("The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. By the operation of that rule a party generally should be awarded neither less nor more than his actual damages" (quotation omitted)).

In this case, however, the jury did not award Jetall the only sum that Choudhri tried to justify at trial and which Jetall's lawyer argued for in closing: $1.2 million. RR 4/165. Rather, the jury inexplicably awarded $900,000 in lost profits. There is no basis in the record whatsoever for determining that Jetall's lost profits were $900,000. Jurors may have chosen to lop off a quarter of what Jetall requested for some reason known only to them, but the $900,000 figure does not appear in any testimony or document. When juries deviate dramatically from the damages proven at trial – whether by awarding too much or too little – reversal is necessary. *See, e.g., Examination Mgmt. Serv.*, 367 S.W.3d at 844 (reversing lost profits award in part because it was $8,262 less than the amount indicated by plaintiff's evidence); *M & A Technology, Inc. v. iValue Group, Inc.*, 295 S.W.3d 356,

28

368 (Tex. App. – El Paso 2009, rev. denied) (award higher than range supported by evidence); *Preston Reserve,* 373 S.W.3d at 667 ("It follows that the trial [court] was not authorized to find that the property's value was $2.4 million when the only competent evidence presented at trial supports a fair market value of at least $2.7 million"); *State v. Hufstutler*, 871 S.W.2d 955, 959-60 (Tex. App. – Austin 1994) (same).

True, "[e]vidence corresponding to the exact amount found by the trier of fact is not essential," and juries can pick a figure that falls on a spectrum supported by the evidence. *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 126 (Tex. App. – Houston [1st Dist.] 2011). The jury may also sometimes blend conflicting expert testimony to arrive at a proper figure. *See Knox v. Taylor*, 992 S.W.2d 40, 63 (Tex. App. – Houston [14th Dist.] 1999). But here, Choudhri did not testify that Jetall's profits would fall within a particular range; he claimed simply that the company lost $1.2 million. RR 3/115-24. Nor did Don and Gayle offer expert testimony of some lower amount that might permit the jury to blend the two contrasting views and somehow arrive at $900,000. Moreover, the jury did not stray only slightly from the evidence. It unaccountably reduced Jetall's claimed amount by a full 25%. In these circumstances, the jury's arbitrary award lends further support to Don and Gayle's argument that it is

29

devoid of record support and thus legally insufficient.

## II. The District Court Erred By Disallowing A Jury Question On Whether The Holmeses' Breach Was Excused By Jetall's Prior Repudiation

### A. Standard Of Review

"In its charge to the jury, a trial court must submit all questions, instructions, and definitions raised by the pleadings and evidence. TEX. R. CIV. P. 278; *Hyundai Motor Co. v. Rodriguez,* 995 S.W.2d 661, 663 (Tex.1999)." *U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 202 (Tex. App. – Houston [1ˢᵗ Dist.] 2003, rev. denied). "A trial court may refuse to submit an issue only if no evidence exists to warrant its submission." *Id.* (citing *Elbaor v. Smith,* 845 S.W.2d 240, 243 (Tex.1992)). "Conflicting evidence presents a fact question for the jury to decide." *Sewing v. Bowman*, 371 S.W.3d 321, 339 (Tex. App. – Houston [1ˢᵗ Dist.] 2012, rev. dismissed).

In this case, Don and Gayle requested submission of a question asking whether their non-performance of the contract – failure to close the sale of the property – was excused by Jetall's prior anticipatory breach or repudiation, but the court refused. RR 4/118-20, 127; SCR (Jury Question No. 4). As a result, this Court should examine the record for any evidence supporting the Holmeses' defense of excuse, and if it exists, reverse and

30

remand for a new trial. *See Stevens v. Nat'l Education Ctrs.*, 11 S.W.3d 185 (Tex. 2000) (Mem. Op.) (remand for new trial is remedy for charge error).

## B. Ample Evidence Supported Don And Gayle's Position That Jetall Repudiated

Don and Gayle presented more than enough evidence that Jetall committed an anticipatory breach or repudiation by using a demand for performance from the Holmeses beyond that required under the agreement as cover for withholding $12,000 to $15,000 from the purchase price. This anticipatory breach excused Don and Gayle's own breach of refusing to close the sale. Given the evidence in the record supporting this theory, the trial court should have submitted the issue to the jury.

"The terms 'repudiation' and 'anticipatory breach' are used somewhat interchangeably by our courts." *Grp. Life and Health Ins. Co. v. Turner*, 620 S.W.2d 670, 673 (Tex. Civ. App. – Dallas 1981). They refer to one party's "positive and unconditional refusal to perform the contract in the future, expressed either before performance is due or after partial performance. It is conduct that shows a fixed intention to abandon, renounce, and refuse to perform the contract." *CMA-CGM (America), Inc. v. Empire Truck Lines, Inc.*, 416 S.W.3d 495, 519 (Tex. App. – Houston [1st Dist.] 2013, rev. denied). The intent to repudiate may be expressed through either words or actions. *See Marriage of Braddock*, 64 S.W.3d 581, 585 (Tex. App. –

31

Texarkana 2001); *Builders Sand, Inc. v. Turtur*, 678 S.W.2d 115, 120 (Tex. App. – Houston [14th Dist.] 1984). When one party repudiates, the other party's performance is excused. *See Hampton v. Minton*, 785 S.W.2d 854, 857 (Tex. App. – Austin 1990); *accord Saenz v. Martinez*, 2008 WL 4809217 (Tex. App. – San Antonio 2008); *Dunham and Ross Co. v. Stevens*, 538 S.W.2d 212, 216 (Tex. App. – Waco 1976).

Don testified that, at his meeting with Choudhri on December 13, 2011, Choudhri told him he would deduct $15,000 or $12,000 from the $450,000 purchase price of the property – ostensibly because Don had not completed the special provisions. RR 2/272-73; RR 3/11, 23; RR 4/102-03. Don also testified that title company employees told him that $15,000 of the funds wired to the company for closing would be placed in escrow, and that Don could not access these funds until Choudhri "fe[lt] like it." RR 2/272-73. Another title company employee told him that Choudhri would deduct $12,000 from the price to be paid at closing. RR 4/96. This evidence establishes that Jetall decided not to perform the contract by paying the required $450,000 purchase price, but instead resolved to pay no more than $435,000 or $438,000 for the property. If credited by a jury, it excuses Don and Gayle's failure to go through with the closing, since they were not

32

obliged to part with the lot for less than Choudhri agreed to when the contract was signed.

According to Don, Choudhri justified his insistence on lowering the purchase price by claiming that Don failed to complete the special provisions, but a jury could find that this was nothing more than a pretext to pay less than the contract required. After all, Choudhri testified that he wanted to close the sale regardless of Don's supposed non-performance, that he would have done so on December 15, and that he would not have sued for reimbursement afterward. RR 3/98-105, 127, 185-86; RR 4/64-65. Indeed, the trial court found that Jetall waived performance of the special provisions as a matter of law. RR 4/4, 9. A jury could therefore have found that they were not material elements of the Holmeses' performance, that Jetall was therefore obligated to pay the full purchase price at closing, and that demanding to pay significantly less based on the special provisions constituted repudiation. *See Hernandez v. Gulf Grp. Lloyds,* 875 S.W.2d 691, 692-93 (Tex. 1994) (discussing materiality of breach); *In re Interest of Doe,* 917 S.W.2d 139, 142 (Tex. App. − Amarillo 1996, writ denied) (substantial compliance excuses "contractual deviations or deficiencies which do not seriously impair the purpose underlying the contractual provision").

33

Even forgetting about waiver and non-materiality, a jury could have found that Don adequately performed the special provisions and that Jetall lacked any justification for withholding $12,000 or $15,000 from the sales price. The contract obligated Don and Gayle to provide a soil report and an electronic survey. App. Tab 2 (Pl. Exh. 1 ¶ 11). The parties agree that Don provided a soil report. Pl. Exh. 10; RR 3/65-67. Choudhri complained that it dated to 1997, RR 3/65-67, but the contract does not expressly require a new or recent report. App. Tab 2 (Pl. Exh. 1 ¶ 11). Moreover, Choudhri admitted telling Don: "Don't worry about the soil report. That's fine. I'll deal with it." RR 3/85-86, 200-01 (Choudhri "willing to… forgive and forget" soil report). Likewise, Don testified that he provided an electronic survey. RR 2/257, RR 4/95. As with the soil report, Choudhri testified that he was expecting a newer one, RR 3/184, but the contract does not expressly require a new survey or one completed only after the replatting. App. Tab 2 (Pl. Exh. 1 ¶ 11). And any understandings or expectations Choudhri may have had about these items based on conversations with Don are irrelevant to what the literal terms required of the Holmeses. *Id.* (Pl. Exh. 1 ¶ 22) ("entire agreement" clause). Thus, a jury could find that Don and Gayle fully complied with the soil report and survey provisions.

As for the replatting, Don acknowledged that he did not finish the task, based on his understanding that this would happen after the closing. RR 2/254-56, 271-72; RR 4/100-01. While this was not compliant with the contract, Don testified that finishing the process would only have cost $525. *Id.* Thus, a jury could find that there was no basis to withhold $12,000 to $15,000 in order to compensate for the failure to complete the replatting before closing, and that Choudhri's stated insistence that he would do so (according to Don) was a repudiation of his obligation to pay $450,000 for the lot. In fact, even if all three items – the soil report, the survey and the replatting – are considered breaches by Don and Gayle, there is no evidence that they would cost Jetall $12,000 to $15,000 to ameliorate. On the contrary, Choudhri conceded that he did not know exactly how much obtaining these items would actually have cost. RR 4/61-62. Hence, there is ample evidence that Choudhri simply resolved to pay a lower price for the property, set out to use the special provisions as a smokescreen for doing so, and thereby anticipatorily breached.

"An anticipatory breach has been committed when one party demands of the other party a performance to which he has no right under the contract and states definitively that unless demand is complied with he will not render the promised performance." *Lytle Lake Water Control and Imp. Dist.*

35

*v. Shaw Envtl., Inc.*, 2006 WL 6863698 at * 5 (N.D. Tex. 2006); *accord Jon-T Farms, Inc. v. Goodpasture, Inc.*, 554 S.W.2d 743, 746 (Tex. App. – Amarillo 1977, writ ref'd n.r.e., *disapproved on other grounds, McKinley v. Drozd*, 685 S.W. 2d 7 (Tex. 1985)) (citing comment to Tex. Bus & Com. Code § 2.610: "repudiation occurs when one party… declares that he will not perform except on conditions which go beyond the contract"); *Humphrey v. Placid Oil Co.*, 142 F. Supp. 246, 252 (E.D. Tex. 1956), *aff'd*, 244 F.2d 184 (5th Cir. 1957).

Examples of this sort of repudiation include refusing to fund a previously agreed settlement unless a party acquiesced in new demands concerning an exchange of stock, *see Dror v. Mushin*, 2013 WL 5643407 at * 5 (Tex. App. – Houston [14[th] Dist.] 2013, rev. denied); refusing to pay for dredging unless the payee used a different measurement of sediment than the contract prescribed, *see Lytle Lake,* 2006 WL 6863698 at * 5; refusing to close a real estate sale absent changes to a loan at odds with the sales contract, *see First Fed. Sav. & Loan Assoc. of Wilmette, Ill. v. Pardue*, 545 F. Supp. 433, 436-37 (N.D. Tex. 1982), *aff'd*, 703 F.2d 555 (5th Cir. 1983); refusing to reinstate an insurance policy without extra, unauthorized premium payments, *see Crown Life Ins. Co. v. Reliable Machine and Supply Co., Inc.*, 427 S.W.2d 145, 150 (Tex. App. – Austin 1968, writ ref'd n.r.e.);

36

and refusing to make payments unless oil well operators ran additional tests not required by the contract. *Humphrey*, 142 F. Supp. at 254.

This is the sort of repudiation that occurred in this case. Here too, a jury could find that Don and Gayle adequately performed the special provisions, that not performing them did not add up to $12,000 or $15,000 anyway, that they were not material, and that Jetall waived them. Under any of these circumstances, Jetall would have no basis under the contract to lodge the new and additional demand of a significantly lower sales price as its condition for consummating the sale. Telling Don that closing would only occur with Jetall withholding or escrowing part of the previously decided purchase price due to the special provisions communicated a repudiation that excused the Holmeses' performance.

In rejecting this argument at trial, the district court construed the written correspondence from Choudhri to Don in December 2011 to be making a new offer – withholding $12,000 in exchange for relief from the special provisions – and that, when Don declined, the new offer "died on the vine." RR 4/7-8, 52-58; Pl. Exh. 23, 24, 29. But the court overlooked the more unequivocal *testimony* from Don that Choudhri told him at their December 13 meeting that he would withhold $12,000 or $15,000 at closing or place it in escrow, as well as Don's testimony that title company

37

employees told him the same thing.  *See supra*.  This testimony alone is some evidence that Jetall committed anticipatory breach.  To the degree that Choudhri's writings might have communicated a different or mixed message, it was the jury's job to choose among the disputed facts and multiple potential meanings once properly instructed by the court on repudiation and excuse.

Moreover, the trial court misconstrued Choudhri's written correspondence.  In his December 13 email, Choudhri did not simply indicate that Jetall would close the sale; he flatly demanded performance of the special provisions ("The property is to be delivered with this done") and insisted that Don either delay the closing or credit $12,000 to Jetall.  Pl. Exh. 23.  If, as discussed above, a jury could find that Don and Gayle had already substantially complied with the special provisions by this time, that they were waived or non-material, or that, at most, they should credit $525 to Jetall to finish the replatting, Choudhri's requirement of either an unspecified delay or the forfeiture of $12,000 was a new and extra-contractual demand that could be construed as repudiation.  *See* pp. 35-36, *supra* (and authority cited therein).  This is even more true of Jetall's lawyer's letter to Don dated December 21.  Pl. Exh. 29.  That letter did not propose deferring the closing but demanded either compliance with the

special provisions or deduction of $12,000 from the sales price, and threatened litigation to boot. *Id.* In any event, while these documents may be subject to more than one reading, Don's testimony alone is some evidence of Jetall's repudiation.

In the end, whether Jetall would have simply closed the sale on December 15 and paid the full purchase price was a disputed issue of fact. Choudhri testified that Jetall would have, and would have forgiven any supposed noncompliance with the special provisions. The documentary evidence is arguably open to interpretation. But Don's testimony directly contradicted Choudhri's account and would permit a jury to find that closing would only have occurred if he and Gayle accepted $12,000 to $15,000 less for their property. Given that testimony, they were entitled to a question on anticipatory breach, and the trial court's failure to submit one requires reversal and a new trial.

## PRAYER

The Court should reverse the award of lost profits and render judgment for Jetall in the amount of $127,800 – representing the $75,000 award for the difference in value of the property and the $52,800 award for attorneys' fees incurred through trial – plus allowable interest. Failing that, the Court should reverse the judgment and remand the case for retrial solely

on liability and on damages based only on the difference between the price Jetall agreed to pay and the market value of the property.  As a last option, the Court should remand and order a retrial on all issues.  In addition, since the district court's judgment will be altered by this Court's judgment, the Court should dissolve the abstract of judgment filed by Jetall during the pendency of this appeal.

August 10, 2015                    Respectfully Submitted,

/s/          *Martin J. Siegel*
Martin J. Siegel
Texas State Bar No. 18342125
LAW OFFICES OF MARTIN J. SIEGEL, P.C.
2222 Dunstan Road
Houston, Texas 77005
Telephone: (713) 226-8566
Martin@Siegelfirm.com

Geoffrey Berg
Texas Bar No. 00793330
BERG FELDMAN JOHNSON BELL, LLP
4203 Montrose Blvd., Suite 150
Houston, Texas 77006
Telephone: (713) 526-0200
Gberg@bfjblaw.com

*Attorneys for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing corrected brief was served on counsel of record for Appellee on December 21, 2015, by electronic means:

Lori Twomey
George May
Twomey May PLLC
2 Riverway, 15th Fl.
Houston, TX 77056

*Counsel for Appellee*

/s/        *Martin J. Siegel*
Martin J. Siegel

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word limit of TEX. R. APP. P. 9.4(i)(2) because this brief contains 9,389 words, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(i)(1).

/s/          *Martin J. Siegel*
Martin J. Siegel


Dated:  December 21, 2015

# APPENDIX

# INDEX

**Tab:**

Final Judgment and Charge of the Court......................................................... 1

Jetall-Holmes Sales Contract, Plaintiff's Exh. 1 ............................................. 2

# TAB 1

NO. 2012-07148

JETALL COMPANIES, INC. § IN THE DISTRICT COURT OF

§

VS. § HARRIS COUNTY, TEXAS

§

DON ABBOTT HOLMES AND §

GAYLE EISER HOLMES § 127TH JUDICIAL DISTRICT

## FINAL JUDGMENT

On December 8, 2014, this cause came to trial. Plaintiff, Jetall Companies, Inc., in person and by its attorney of record, announced ready for trial. Defendants, Don Abbott Holmes and Gayle Eiser Holmes, in person and by their attorneys of record, announced ready for trial. A jury was demanded and duly impaneled and the cause proceeded to trial.

A jury composed of twelve jurors was duly impaneled, and the case proceeded to trial. At the conclusion of the evidence, the Court submitted the questions of fact with the Court's instructions to the 12 duly selected jurors. The Charge of the Court and the verdict of the jury are incorporated for all purposes by reference and attached hereto as Exhibit "A."

On December 11, 2014, the jury returned its verdict and awarded Plaintiff, Jetall Companies, Inc. $975,000.00 in actual damages.

Additionally, the jury awarded Plaintiff, Jetall Companies, Inc. attorney's fees in the amount of $52,800 for preparation and trial, $15,000 for an appeal to the Court of Appeals, $10,000 for an appeal to the Supreme Court of Texas and $15,000 for representation of the petition for review in the Supreme Court of Texas.

Based on all of the foregoing, it is the Court's intention to dispose of all issues before the Court and to enter a Final Judgment. It is therefore,

ORDERED, ADJUDGED AND DECREED that Plaintiff, Jetall Companies, Inc. recover actual damages from Defendants, Don Abbott Holmes and Gayle Eiser Holmes, in the sum of $975,000 (NINE HUNDRED SEVENTY FIVE THOUSAND AND ZERO CENTS). It is further,

ORDERED, ADJUDGED AND DECREED that Plaintiff, Jetall Companies, Inc., shall have and recover from Defendants, Don Abbott Holmes and Gayle Eiser Holmes on its past actual damages of $975,000 from December 21, 2011, the date of written notice of the Plaintiff's claim, until the day before this Judgment is entered. From the date of written notice of Plaintiff's claim until January 22, 2015 (3 years and 32 days), the total amount is $150,522.12. The daily rate is $133.56 per day. Thus, the Court finds that the total for prejudgment interest is $150,522.12. It is further,

FILED
Chris Daniel
District Clerk

JAN 2 2 2015

Time:_____
Harris County, Texas

By_____
Deputy

300

ORDERED, ADJUDGED AND DECREED that Plaintiff, Jetall Companies, Inc. recover reasonable and necessary attorney's fees in the amount of $52,800. It is further,

ORDERED, ADJUDGED AND DECREED that Plaintiff, Jetall Companies, Inc. shall recover attorney's fees in the amount of $15,000 in the event Defendants, Don Abbott Holmes and Gayle Eiser Holmes unsuccessfully appeal this Judgment to the Court of Appeals. It is further,

ORDERED, ADJUDGED AND DECREED that Plaintiff, Jetall Companies, Inc. shall recover attorney's fees in the amount of $10,000 in the event Defendants, Don Abbott Holmes and Gayle Eiser Holmes unsuccessfully appeal this Judgment to the Supreme Court of Texas, and an additional $15,000 for representation of the petition for review in the Supreme Court of Texas.

ORDERED, ADJUDGED AND DECREED that the Judgment here rendered shall bear interest at the rate of 5% compounded annually from the date of Judgment until paid. It is further,

ORDERED, ADJUDGED AND DECREED that all taxable court costs shall be assessed against Defendants, Don Abbott Holmes and Gayle Eiser Holmes and awarded to Plaintiff.

All writs and processes for the enforcement and collection of this Judgment may issue as necessary.

All other relief not expressly granted in this Judgment is denied. This Judgment finally disposed of all parties and claims and is appealable.

SIGNED this 22nd day of January, 2015.

_____
Honorable R.K. Sandill
127th Judicial District Court

APPROVED:

_____
Mike O'Brien
State Bar No. 15170200
14355 Highway 105
Washington, TX 77880
(713) 222-0088

2

301

ORIGINAL

P.15

NO. 2012-07148

| | | |
|---|---|---|
| JETALL COMPANIES. INC. | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| DON ABBOTT HOLMES AND | § | |
| GAYLE EISER HOLMES | § | 127TH JUDICIAL DISTRICT |

## CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

This case is submitted to you by asking questions about the facts, which you must decide from the evidence you have heard in this trial. In discharging your responsibility on this jury, you will observe all the instructions which have previously been given to you. After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic devices during your deliberations for any reason. The bailiff will give you a number where others may contact you in case of an emergency.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

FILED
Chris Daniel
District Clerk

DEC 11 2014

Time:_____
Harris County, Texas
By_____
Deputy

1

302

Here are the instructions for answering the questions.

1. Do not let bias, prejudice, or sympathy play any part in your decision.

2. Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3. You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Answer "yes" or "no" to all questions, unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence, unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence, unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11. The answers to the questions must be based on the decision of at least 10 of the 12 jurors, unless you are told otherwise. The same 10 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

2

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

A fact may be established by direct evidence or circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

Deposition testimony consists of the sworn testimony of witnesses taken by a court reporter in the presence of attorneys for the parties. Deposition testimony read into evidence during the trial or played by videotape is to be considered by you in the same manner as though the witness had personally appeared before you and testified from the witness stand.

The rules of evidence provide that where testimony and opinions on certain issues might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify and state his or her opinion concerning such matters.

You should consider each expert opinion received in evidence in this case and give it such weight as you may think it deserves. If you should decide that the opinion of an expert witness is not based on sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evidence, then you may disregard the opinion entirely.

When you have answered all the questions you are required to answer under the instructions of the judge, and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict, and then you will return into court with your verdict.

3

304

# DEFINITIONS

You shall use the following definitions for your deliberations:

1. **"CONTRACT"** means Unimproved Property Contract between DON HOLMES, as Seller, and JETALL COMPANIES, INC., as Buyer, for the purchase of the Property dated October 28, 2011.

2. **"DON HOLMES"** means the Defendant, DON ABBOTT HOLMES.

3. **"GAYLE HOLMES"** means the Defendant GAYLE EISER HOLMES.

4. **"JETALL COMPANIES"** means the Plaintiff JETALL COMPANIES, INC.

5. **"PROPERTY"** means Lots 3, 4, 5 and 12, in Block 32, of NP TURNER'S ADDITION, to the City of Houston, Harris County, Texas, according to the Map or Plat thereof Recorded in Volume 359, Page 335, of the Deed Records of Harris County, Texas, and said tract being physically described as 1204 Banks, Houston, Texas 77006.

# STIPULATIONS

The parties have stipulated as follows:

1. Gayle Holmes is a co-owner of the Banks Street Property at the time the Contract was executed.

2. Gayle Holmes did not sign the Contract.

3. The real estate sale failed to close.

4

305

## QUESTION NO. 1

Did Don Holmes have authority to act for Gayle Holmes in executing the *Unimproved Property Contract* for the sale of the Banks property, jointly owned by Don Holmes and Gayle Holmes, to Jetall Companies, Inc.?

"Actual Authority" exists if (1) Gayle Holmes intentionally conferred authority on Don Holmes to act on her behalf and for her benefit; or (2) Gayle Holmes, intentionally, or by lack of ordinary care, allowed Don Holmes to believe he possessed authority to act on behalf of and for the benefit of Gayle Holmes.

"Apparent Authority" exists if Gayle Holmes: (1) knowingly permitted Don Holmes to hold himself out as having authority; or (2) through lack of ordinary care, bestowed on Don Holmes such indications of authority that lead a reasonably prudent company to rely on the apparent existence of authority to its detriment. Only the acts of Gayle Holmes may be considered in determining whether apparent authority exists.

Answer "Yes" or "No"

ANSWER: ___YES___

5

306

If you answered "Yes" to Question 1, go to Question 3
If you answered "No" to Question 1, answer this question.

## QUESTION NO. 2

**Did Gayle Holmes ratify the contract by retaining benefits of the transaction after she acquired full knowledge of the unauthorized conduct of Don Holmes?**

A party's conduct includes conduct of others that the party has ratified. "Ratification" is defined as the act of ratifying, or the condition of being ratified. "Ratify" means to give formal sanction to; approve and so make valid. Ratification can be express or implied.

"Implied Ratification" occurs if Gayle Holmes, though she may have been unaware of unauthorized conduct taken by Don Holmes on her behalf at the time it occurred, retains the benefits of the transaction involving the unauthorized conduct after she acquired full knowledge of the unauthorized conduct. Implied ratification results in the ratification of the entire transaction.

**Answer "Yes" or "No"**

      **ANSWER:** _____  N/A

6

If you answered "Yes" to Question 1 or Question 2, answer this question.

## QUESTION NO. 3

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Jetall Companies for its damages, if any, that resulted from Don Holmes' failure to comply with the Contract?

Consider the following elements of damages, if any, and none other.

The difference, if any, between the price Jetall Companies agreed to pay for the Property under the Contract and the market value of the Property. The difference in value, if any, shall be determined at the time and place of the breach.

The lost profit, if any, that Jetall Companies would have made from developing the Property into two single-family houses, calculated as the sales price of the single-family houses less the cost of construction, the cost of marketing, and the cost of the Property under the Contract.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the Court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

a) Difference in Value, if any:

ANSWER: $ 75,000

b) Lost Profits, if any:

ANSWER: $ 900,000

7

308

## QUESTION NO. 4

**Did Don Holmes commit fraud against Jetall Companies, Inc.?**

Fraud occurs when

1. A party makes a material misrepresentation; and
2. The misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion; and
3. The misrepresentation is made with the intention that it should be acted on by the other party; and
4. The other party relies on the misrepresentation and thereby suffers injury.

Fraud also occurs when

1. A party fails to disclose a material fact within the knowledge of that party; and
2. The party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; and
3. The party intends to induce the other party to take some action by failing to disclose the fact; and
4. The other party suffers injury as a result of acting without knowledge of the undisclosed fact.

Statutory Fraud occurs when

1. A party makes a false promise to do an act; and
2. The promise is material; and
3. The promise is made with the intention of not fulfilling it; and
4. The promise is made to a person for the purpose of inducing that person to enter into a contract; and
5. That person relies on the promise in entering the contract.

"Misrepresentation" means -
A false statement of fact

8

A seller of real estate has a duty to disclose known material facts about the property if the facts would not be (1) discoverable by the buyer's exercise of ordinary care and diligence or (2) uncovered by a reasonable investigation and inquiry. The seller has no duty to disclose facts it does not know. It is also not liable for failing to disclose facts it should have known.

Answer "Yes" or "No"

Answer: _____ No _____

## CERTIFICATE OF UNANIMITY

If you answered Question No. 4, please certify if the jury was unanimous in its answer.

_____James E. Leggett_____
**Presiding Juror Printed Name**

_____
**Signature of Presiding Juror**

If you answered "Yes" to Question 4, answer this question.

## QUESTION NO. 5

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Jetall Companies for its damages, if any, that were proximately caused by such fraud?

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other.

a) The difference, if any, between the price Jetall Companies agreed to pay for the Property under the Contract and the market value of the Property. The difference in value, if any, shall be determined at the time and place of the breach.

b) The lost profit, if any, that Jetall Companies would have made from developing the Property into two single-family houses, calculated as the sales price of the single-family houses less the cost of construction, the cost of marketing, and the cost of the Property under the Contract.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the Court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

a) Difference in Value, if any:

ANSWER: $ _____

b) Lost Profits, if any:

ANSWER: $ _____

*N/A*

10

311

Answer the following question only if you answered "Yes" unanimously to Question No. 4. Otherwise, do not answer the following question.

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer any part of the following question.

## QUESTION NO. 6

Do you find by clear and convincing evidence that the harm to Jetall Companies, Inc. resulted from Don Holmes' fraud or malice?

"Clear and convincing evidence" means the measure or degree of proof that produced a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent to cause substantial injury or harm by Don Abbott Holmes to Jetall Companies, Inc.

Answer "Yes" or "No"

ANSWER: _____

N/A

## CERTIFICATE OF UNANIMITY

If you answered Question No. 6, please certify if the jury was unanimous in its answer.

_____          _____
Presiding Juror Printed Name               Signature of Presiding Juror

11

Answer the following question regarding a plaintiff only if you unanimously answered "Yes" as to that plaintiff in Question No. 4 & 6. Otherwise, do not answer the following question.

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer any part of the following question.

You must unanimously agree on the amount of any award of exemplary damages.

## QUESTION NO. 7

What sum of money, if now paid in cash, should be assessed against Don Abbott Holmes and awarded to Jetall Companies, Inc. as exemplary damages, if any, for the conduct found in response to Question 6?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are –

1. The nature of the wrong.
2. The character of the conduct involved.
3. The degree of culpability of Don Abbott Holmes.
4. The situation and sensibilities of the parties concerned.
5. The extent to which such conduct offends a public sense of justice and propriety.
6. The net worth of Don Abbott Holmes.

N/A

Answer in dollars and cents, if any.

ANSWER: _____

## CERTIFICATE OF UNANIMITY

If you answered Question No. 7, please certify if the jury was unanimous in its answer.

_____          _____
Presiding Juror Printed Name          Signature of Presiding Juror

12

313

If you have answered "Yes" to Question No. 1 or Question No. 2, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 8

What is a reasonable fee for the necessary services of Jetall Companies's attorney in this case, stated in dollars and cents?

Factors to consider for in awarding attorney's fees, if any, are –

1. The time and labor required;
2. The novelty and difficulty of the questions involved;
3. The skill required to perform the legal services properly;
4. The fee customarily charged in the locality for similar legal services;
5. The amount involved in the controversy
6. The benefits to the claimant that the attorney is responsible for securing; and
7. The experience and ability of the attorney performing the services.

Answer with an amount for each of the following:

a) For preparation and trial.

ANSWER: $ 52,800

b) For an appeal to the Court of Appeals

ANSWER: $ 15,000

c) For an appeal to the Supreme Court of Texas

ANSWER: $ 10,000

d) For representation of the petition for review in the Supreme Court of Texas

ANSWER: $ 15,000

13

314

**Presiding Juror:**

1.  When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2.  The presiding juror has these duties:

    a.  have the complete charge read aloud if it will be helpful to your deliberations;

    b.  preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

    c.  give written questions or comments to the bailiff who will give them to the judge;

    d.  write down the answers you agree on;

    e.  get the signatures for the verdict certificate; and

    f.  notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

**Instructions for Signing the Verdict Certificate:**

1.  Unless otherwise instructed, you may answer the questions on a vote of ten jurors. The same ten jurors must agree on every answer in the charge. This means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another answer.

2.  If ten jurors agree on every answer, those ten jurors sign the verdict.
    If eleven jurors agree on every answer, those eleven jurors sign the verdict.
    If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3.  All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers. But when you sign the verdict, only those ten who agree on every answer will sign the verdict.

Do you understand these instructions? If you do not, please tell me now.

_____
JUDGE PRESIDING

14

# Verdict Certificate

Check one:

___✓___ Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.

_____          _____James E. Leggett_____
Signature of Presiding Juror                Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

Signature                                   Name Printed

1. _____              _____

2. _____              _____

3. _____              _____

4. _____              _____

5. _____              _____

6. _____              _____

7. _____              _____

8. _____              _____

9. _____              _____

10. _____             _____

11. _____             _____

15

316

# TAB 2

# UNIMPROVED PROPERTY CONTRACT

### NOTICE:  Not For Use For Condominium Transactions

1.  **PARTIES:** The parties to this contract are ___Don   Holmes___ (Seller)
    and ___Jetall  Companies Inc and/or assigns___ (Buyer). Seller agrees
    to sell and convey to Buyer and Buyer agrees to buy from Seller the Property defined below.

2.  **PROPERTY:** Lot ___(7500 sq ft Lot)  3, 4, 5 & 12___ , Block ___32___
    ___Turner NP  (Attached Ex "A"___ Addition, City of
    ___Houston___ , County of ___HARRIS___ ,
    Texas, known as ___1204 BANKS  Houston TX 77006___
    (address/zip code), or as described on attached exhibit together with all rights, privileges and
    appurtenances pertaining thereto, including but not limited to: water rights, claims, permits,
    strips and gores, easements, and cooperative or association memberships (the Property).

3.  **SALES PRICE:**
    A.  Cash portion of Sales Price payable by Buyer at closing . . . . . . . . . . . . . . . . .$ _____
    B.  Sum of all financing described below (excluding any loan funding
        fee or mortgage insurance premium) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ _____
    C.  Sales Price (Sum of A and B) . . . . . . . . . . . . . . . . . . . . . . . . .$ ___450,000 xx/00___

4.  **FINANCING:** The portion of Sales Price not payable in cash will be paid as follows: (Check
    applicable boxes below)
    ☐ A.  THIRD PARTY FINANCING: One or more third party mortgage loans in the total amount of
        $_____ (excluding any loan funding fee or mortgage insurance premium).
        (1) Property Approval: If the Property does not satisfy the lenders' underwriting
            requirements for the loan(s) (including, but not limited to appraisal, insurability and
            lender required repairs), Buyer may terminate this contract by giving notice to Seller
            prior to closing and the earnest money will be refunded to Buyer.
        (2) Credit Approval: (Check one box only)
            ☐ (a) This contract is subject to Buyer being approved for the financing described in the
                attached Third Party Financing Addendum for Credit Approval.
            ☐ (b) This contract is not subject to Buyer being approved for financing and does not
                involve FHA or VA financing.
    ☐ B.  ASSUMPTION: The assumption of the unpaid principal balance of one or more promissory
        notes described in the attached TREC Loan Assumption Addendum.
    ☐ C.  SELLER FINANCING: A promissory note from Buyer to Seller of $_____ ,
        secured by vendor's and deed of trust liens, and containing the terms and conditions
        described in the attached TREC Seller Financing Addendum. If an owner policy of title
        insurance is furnished, Buyer shall furnish Seller with a mortgagee policy of title insurance.

5.  **EARNEST MONEY:** Upon execution of this contract by all parties, Buyer shall deposit $___10,000 xx/00___
    as earnest money with ___Declaration Title Co (Bonnie)___, as escrow agent,
    at ___8711  Highway  6  North STE 100  Houston TX 77095___ (address). Buyer
    shall deposit additional earnest money of $___N/A___ with escrow agent within _____ days
    after the effective date of this contract. If Buyer fails to deposit the earnest money as required
    by this contract, Buyer will be in default.

6.  **TITLE POLICY AND SURVEY:**
    A.  TITLE POLICY: Seller shall furnish to Buyer at ☒ Seller's ☐ Buyer's expense an owner policy of
        title insurance (Title Policy) issued by ___Declaration  Title___
        (Title Company) in the amount of the Sales Price, dated at or after closing, insuring Buyer
        against loss under the provisions of the Title Policy, subject to the promulgated exclusions
        (including existing building and zoning ordinances) and the following exceptions:
        (1) Restrictive covenants common to the platted subdivision in which the Property is located.
        (2) The standard printed exception for standby fees, taxes and assessments.
        (3) Liens created as part of the financing described in Paragraph 4.
        (4) Utility easements created by the dedication deed or plat of the subdivision in which the
            Property is located.
        (5) Reservations or exceptions otherwise permitted by this contract or as may be approved by
            Buyer in writing.
        (6) The standard printed exception as to marital rights.
        (7) The standard printed exception as to waters, tidelands, beaches, streams, and related
            matters.
        (8) The standard printed exception as to discrepancies, conflicts, shortages in area or
            boundary lines, encroachments or protrusions, or overlapping improvements. Buyer, at
            Buyer's expense, may have the exception amended to read, "shortages in area".

Jetall Investment & Realty 3500 West Loop S Ste 255 Houston, TX 77027          Phone: (630)420-8200     Fax:
Nazem Choudhri                 Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.ziplogix.com

PLAINTIFF'S
EXHIBIT
1

B. **COMMITMENT:** Within 20 days after the Title Company receives a copy of this contract, Seller shall furnish to Buyer a commitment for title insurance (Commitment) and, at Buyer's expense, legible copies of restrictive covenants and documents evidencing exceptions in the Commitment (Exception Documents) other than the standard printed exceptions. Seller authorizes the Title Company to deliver the Commitment and Exception Documents to Buyer at Buyer's address shown in Paragraph 21. If the Commitment and Exception Documents are not delivered to Buyer within the specified time, the time for delivery will be automatically extended up to 15 days or the Closing Date, whichever is earlier.

C. **SURVEY:** The survey must be made by a registered professional land surveyor acceptable to the Title Company and Buyer's lender(s). (Check one box only)

☒ (1) Within __5__ days after the effective date of this contract, Seller shall furnish to Buyer and Title Company Seller's existing survey of the Property and a Residential Real Property Affidavit promulgated by the Texas Department of Insurance (T-47 Affidavit). **If Seller fails to furnish the existing survey or affidavit within the time prescribed, Buyer shall obtain a new survey at Seller's expense no later than 3 days prior to Closing Date.** If the existing survey or affidavit is not acceptable to Title Company or Buyer's lender(s), Buyer shall obtain a new survey at ☒ Seller's ☐ Buyer's expense no later than 3 days prior to Closing Date.

☐ (2) Within _____ days after the effective date of this contract, Buyer shall obtain a new survey at Buyer's expense. Buyer is deemed to receive the survey on the date of actual receipt or the date specified in this paragraph, whichever is earlier.

☐ (3) Within _____ days after the effective date of this contract, Seller, at Seller's expense shall furnish a new survey to Buyer.

D. **OBJECTIONS:** Buyer may object in writing to (i) defects, exceptions, or encumbrances to title: disclosed on the survey other than items 6A(1) through (7) above; or disclosed in the Commitment other than items 6A(1) through (8) above; (ii) any portion of the Property lying in a special flood hazard area (Zone V or A) as shown on the current Federal Emergency Management Agency map; or (iii) any exceptions which prohibit the following use or activity:

_____.

Buyer must object the earlier of (i) the Closing Date or (ii) __10__ days after Buyer receives the Commitment, Exception Documents, and the survey. Buyer's failure to object within the time allowed will constitute a waiver of Buyer's right to object; except that the requirements in Schedule C of the Commitment are not waived. Provided Seller is not obligated to incur any expense, Seller shall cure the timely objections of Buyer or any third party lender within 15 days after Seller receives the objections and the Closing Date will be extended as necessary. If objections are not cured within such 15 day period, this contract will terminate and the earnest money will be refunded to Buyer unless Buyer waives the objections.

E. **TITLE NOTICES:**

(1) ABSTRACT OR TITLE POLICY: Broker advises Buyer to have an abstract of title covering the Property examined by an attorney of Buyer's selection, or Buyer should be furnished with or obtain a Title Policy. If a Title Policy is furnished, the Commitment should be promptly reviewed by an attorney of Buyer's choice due to the time limitations on Buyer's right to object.

(2) PROPERTY OWNERS ASSOCIATION(S) MANDATORY MEMBERSHIP: The Property ☐ is ☒ is not subject to mandatory membership in a property owners association(s). If the Property is subject to mandatory membership in a property owners association(s), Seller notifies Buyer under §5.012, Texas Property Code, that, as a purchaser of property in the residential community identified in Paragraph 2 in which the Property is located, you are obligated to be a member of the property owners association(s). Restrictive covenants governing the use and occupancy of the Property and a dedicatory instrument governing the establishment, maintenance, and operation of this residential community have been or will be recorded in the Real Property Records of the county in which the Property is located. Copies of the restrictive covenants and dedicatory instrument may be obtained from the county clerk. You are obligated to pay assessments to the property owners association(s). The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of the Property. **If Buyer is concerned about these matters, the TREC promulgated Addendum for Property Subject to Mandatory Membership in a Property Owners Association should be used for each association.**

(3) STATUTORY TAX DISTRICTS: If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Seller to deliver and Buyer to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this contract.

(4) TIDE WATERS: If the Property abuts the tidally influenced waters of the state, §33.135, Texas Natural Resources Code, requires a notice regarding coastal area property to be included in the contract. An addendum containing the notice promulgated by TREC or required by the parties must be used.

TREC NO. 9-9

(5) ANNEXATION: If the Property is located outside the limits of a municipality, Seller notifies Buyer under §5.011, Texas Property Code, that the Property may now or later be included in the extraterritorial jurisdiction of a municipality and may now or later be subject to annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

(6) PROPERTY LOCATED IN A CERTIFICATED SERVICE AREA OF A UTILITY SERVICE PROVIDER: Notice required by §13.257, Water Code: The real property, described in Paragraph 2, that you are about to purchase may be located in a certificated water or sewer service area, which is authorized by law to provide water or sewer service to the properties in the certificated area. If your property is located in a certificated area there may be special costs or charges that you will be required to pay before you can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to your property. You are advised to determine if the property is in a certificated area and contact the utility service provider to determine the cost that you will be required to pay and the period, if any, that is required to provide water or sewer service to your property. The undersigned Buyer hereby acknowledges receipt of the foregoing notice at or before the execution of a binding contract for the purchase of the real property described in Paragraph 2 or at closing of purchase of the real property.

(7) PUBLIC IMPROVEMENT DISTRICTS: If the Property is in a public improvement district, §5.014, Property Code, requires Seller to notify Buyer as follows: As a purchaser of this parcel of real property you are obligated to pay an assessment to a municipality or county for an improvement project undertaken by a public improvement district under Chapter 372, Local Government Code. The assessment may be due annually or in periodic installments. More information concerning the amount of the assessment and the due dates of that assessment may be obtained from the municipality or county levying the assessment. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of your property.

(8) TEXAS AGRICULTURAL DEVELOPMENT DISTRICT: The Property ☐ is ☒ is not located in a Texas Agricultural Development District. For additional information, contact the Texas Department of Agriculture.

## 7. PROPERTY CONDITION:

A. ACCESS, INSPECTIONS AND UTILITIES: Seller shall permit Buyer and Buyer's agents access to the Property at reasonable times. Buyer may have the Property inspected by inspectors selected by Buyer and licensed by TREC or otherwise permitted by law to make inspections. Seller at Seller's expense shall turn on existing utilities for inspections.
NOTICE: Buyer should determine the availability of utilities to the Property suitable to satisfy Buyer's needs.

B. ACCEPTANCE OF PROPERTY CONDITION: (Check one box only)
☒ (1) Buyer accepts the Property in its present condition.
☐ (2) Buyer accepts the Property in its present condition provided Seller, at Seller's expense, shall complete the following specific repairs and treatments: _____
_____. (Do not insert general phrases, such as "subject to inspections," that do not identify specific repairs.)
NOTICE TO BUYER AND SELLER: Buyer's agreement to accept the property in its present condition under Paragraph 7B(1) or (2) does not preclude Buyer from inspecting the Property under Paragraph 7A, from negotiating repairs or treatments in a subsequent amendment, or from terminating this contract during the Option Period, if any.

C. COMPLETION OF REPAIRS: Unless otherwise agreed in writing, Seller shall complete all agreed repairs prior to the Closing Date. All required permits must be obtained, and repairs must be performed by persons who are licensed or otherwise permitted by law to provide such repairs. At Buyer's election, any transferable warranties received by Seller with respect to the repairs will be transferred to Buyer at Buyer's expense. If Seller fails to complete any agreed repairs prior to the Closing Date, Buyer may do so and receive reimbursement from Seller at closing. The Closing Date will be extended up to 15 days, if necessary, to complete repairs.

D. ENVIRONMENTAL MATTERS: Buyer is advised that the presence of wetlands, toxic substances, including asbestos and wastes or other environmental hazards, or the presence of a threatened or endangered species or its habitat may affect Buyer's intended use of the Property. If Buyer is concerned about these matters, an addendum promulgated by TREC or required by the parties should be used.

E. SELLER'S DISCLOSURES: Except as otherwise disclosed in this contract, Seller has no knowledge of the following:
(1) any flooding of the Property;
(2) any pending or threatened litigation, condemnation, or special assessment affecting the Property;
(3) any environmental hazards or conditions affecting the Property;
(4) any dumpsite, landfill, or underground tanks or containers now or previously located on the Property;

(5) any wetlands, as defined by federal or state law or regulation, affecting the Property; or
(6) any threatened or endangered species or their habitat affecting the Property.

8. **BROKERS' FEES:** All obligations of the parties for payment of brokers' fees are contained in separate written agreements.

9. **CLOSING:**
   A. The closing of the sale will be on or before _30 bus days after title commitment_, or within 7 days after objections made under Paragraph 6D have been cured or waived, whichever date is later (Closing Date). If either party fails to close the sale by the Closing Date, the non-defaulting party may exercise the remedies contained in Paragraph 15.
   B. At closing:
      (1) Seller shall execute and deliver a general warranty deed conveying title to the Property to Buyer and showing no additional exceptions to those permitted in Paragraph 6 and furnish tax statements or certificates showing no delinquent taxes on the Property.
      (2) Buyer shall pay the Sales Price in good funds acceptable to the escrow agent.
      (3) Seller and Buyer shall execute and deliver any notices, statements, certificates, affidavits, releases, loan documents and other documents reasonably required for the closing of the sale and the issuance of the Title Policy.
      (4) There will be no liens, assessments, or security interests against the Property which will not be satisfied out of the sales proceeds unless securing the payment of any loans assumed by Buyer and assumed loans will not be in default.
      (5) If the Property is subject to a lease, Seller shall (i) deliver to Buyer the lease(s) and the move-in condition form signed by the tenant, if any, and (ii) transfer security deposits (as defined under §92.102, Property Code), if any, to Buyer. In such an event, Buyer shall deliver to the tenant a signed statement acknowledging that the Buyer has received the security deposit and is responsible for the return of the security deposit, and specifying the exact dollar amount of the security deposit.

10. **POSSESSION:** Seller shall deliver to Buyer possession of the Property in its present or required condition upon closing and funding.

11. **SPECIAL PROVISIONS:** (Insert only factual statements and business details applicable to the sale. TREC rules prohibit licensees from adding factual statements or business details for which a contract addendum or other form has been promulgated by TREC for mandatory use.)

- Seller warrants the property is unrestricted and has no easements.

- Seller warrants property is not on a Fault line

- Seller warrants property is environmentally clean

- Seller to provide replatting of property with elec survey & soil test report.

- Seller warrants property has no easements (neg or positive) and no height restrictions.

12. **SETTLEMENT AND OTHER EXPENSES:**
   A. The following expenses must be paid at or prior to closing:
      (1) Expenses payable by Seller (Seller's Expenses):
         (a) Releases of existing liens, including prepayment penalties and recording fees; release of Seller's loan liability; tax statements or certificates; preparation of deed; one-half of escrow fee; and other expenses payable by Seller under this contract.
         (b) Seller shall also pay an amount not to exceed $ _____ to be applied in the following order: Buyer's Expenses which Buyer is prohibited from paying by FHA, VA, Texas Veterans Land Board or other governmental loan programs, and then to other Buyer's Expenses as allowed by the lender.
      (2) Expenses payable by Buyer (Buyer's Expenses): Appraisal fees; loan application fees; adjusted origination charges; credit reports; preparation of loan documents; interest on the notes from date of disbursement to one month prior to dates of first monthly payments; recording fees; copies of easements and restrictions; loan title policy with

endorsements required by lender; loan-related inspection fees; photos; amortization schedules; one-half of escrow fee; all prepaid items, including required premiums for flood and hazard insurance, reserve deposits for insurance, ad valorem taxes and special governmental assessments; final compliance inspection; courier fee; repair inspection; underwriting fee; wire transfer fee; expenses incident to any loan; Private Mortgage Insurance Premium (PMI), VA Loan Funding Fee, or FHA Mortgage Insurance Premium (MIP) as required by the lender; and other expenses payable by Buyer under this contract.

B. If any expense exceeds an amount expressly stated in this contract for such expense to be paid by a party, that party may terminate this such contract unless the other party agrees to pay such excess. Buyer may not pay charges and fees expressly prohibited by FHA, VA, Texas Veterans Land Board or other governmental loan program regulations.

13. **PRORATIONS AND ROLLBACK TAXES:**
   A. PRORATIONS: Taxes for the current year, interest, maintenance fees, assessments, dues and rents will be prorated through the Closing Date. The tax proration may be calculated taking into consideration any change in exemptions that will affect the current year's taxes. If taxes for the current year vary from the amount prorated at closing, the parties shall adjust the prorations when tax statements for the current year are available. If taxes are not paid at or prior to closing, Buyer shall pay taxes for the current year.
   B. ROLLBACK TAXES: If this sale or Buyer's use of the Property after closing results in the assessment of additional taxes, penalties or interest (Assessments) for periods prior to closing, the Assessments will be the obligation of Buyer. If Seller's change in use of the Property prior to closing or denial of a special use valuation on the Property claimed by Seller results in Assessments for periods prior to closing, the Assessments will be the obligation of Seller. Obligations imposed by this paragraph will survive closing.

14. **CASUALTY LOSS:** If any part of the Property is damaged or destroyed by fire or other casualty after the effective date of this contract, Seller shall restore the Property to its previous condition as soon as reasonably possible, but in any event by the Closing Date. If Seller fails to do so due to factors beyond Seller's control, Buyer may (a) terminate this contract and the earnest money will be refunded to Buyer (b) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (c) accept the Property in its damaged condition with an assignment of insurance proceeds and receive credit from Seller at closing in the amount of the deductible under the insurance policy. Seller's obligations under this paragraph are independent of any other obligations of Seller under this contract.

15. **DEFAULT:** If Buyer fails to comply with this contract, Buyer will be in default, and Seller may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from this contract. If, due to factors beyond Seller's control, Seller fails within the time allowed to make any non-casualty repairs or deliver the Commitment, or survey, if required of Seller, Buyer may (a) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (b) terminate this contract as the sole remedy and receive the earnest money. If Seller fails to comply with this contract for any other reason, Seller will be in default and Buyer may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money, thereby releasing both parties from this contract.

16. **MEDIATION:** It is the policy of the State of Texas to encourage resolution of disputes through alternative dispute resolution procedures such as mediation. Any dispute between Seller and Buyer related to this contract which is not resolved through informal discussion ☐ will ☐ will not be submitted to a mutually acceptable mediation service or provider. The parties to the mediation shall bear the mediation costs equally. This paragraph does not preclude a party from seeking equitable relief from a court of competent jurisdiction.

17. **ATTORNEY'S FEES:** A Buyer, Seller, Listing Broker, Other Broker, or escrow agent who prevails in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding.

18. **ESCROW:**
   A. ESCROW: The escrow agent is not (i) a party to this contract and does not have liability for the performance or nonperformance of any party to this contract, (ii) liable for interest on the earnest money and (iii) liable for the loss of any earnest money caused by the failure of any financial institution in which the earnest money has been deposited unless the financial institution is acting as escrow agent.
   B. EXPENSES: At closing, the earnest money must be applied first to any cash down payment, then to Buyer's Expenses and any excess refunded to Buyer. If no closing occurs, escrow agent may: (i) require a written release of liability of the escrow agent from all parties, (ii) require payment of unpaid expenses incurred on behalf of a party, and (iii) only deduct from

the earnest money the amount of unpaid expenses incurred on behalf of the party receiving the earnest money.

C. **DEMAND:** Upon termination of this contract, either party or the escrow agent may send a release of earnest money to each party and the parties shall execute counterparts of the release and deliver same to the escrow agent. If either party fails to execute the release, either party may make a written demand to the escrow agent for the earnest money. If only one party makes written demand for the earnest money, escrow agent shall promptly provide a copy of the demand to the other party. If escrow agent does not receive written objection to the demand from the other party within 15 days, escrow agent may disburse the earnest money to the party making demand reduced by the amount of unpaid expenses incurred on behalf of the party receiving the earnest money and escrow agent may pay the same to the creditors. If escrow agent complies with the provisions of this paragraph, each party hereby releases escrow agent from all adverse claims related to the disbursal of the earnest money.

D. **DAMAGES:** Any party who wrongfully fails or refuses to sign a release acceptable to the escrow agent within 7 days of receipt of the request will be liable to the other party for liquidated damages in an amount equal to the sum of: (i) three times the amount of the earnest money; (ii) the earnest money; (iii) reasonable attorney's fees; and (iv) all costs of suit.

E. **NOTICES:** Escrow agent's notices will be effective when sent in compliance with Paragraph 21. Notice of objection to the demand will be deemed effective upon receipt by escrow agent.

19. **REPRESENTATIONS:** All covenants, representations and warranties in this contract survive closing. If any representation of Seller in this contract is untrue on the Closing Date, Seller will be in default. Unless expressly prohibited by written agreement, Seller may continue to show the Property and receive, negotiate and accept back up offers.

20. **FEDERAL TAX REQUIREMENTS:** If Seller is a "foreign person," as defined by applicable law, or if Seller fails to deliver an affidavit to Buyer that, Seller is not a "foreign person," then Buyer shall withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the same to the Internal Revenue Service together with appropriate tax forms. Internal Revenue Service regulations require filing written reports if currency in excess of specified amounts is received in the transaction.

21. **NOTICES:** All notices from one party to the other must be in writing and are effective when mailed to, hand-delivered at, or transmitted by facsimile or electronic transmission as follows:

**To Buyer at:**

_2500 W. loop South STE 255_

_Houston Tx 77027_

Telephone: _713 789 7654_

Facsimile: _____

E-mail: _ali@thallcompanies.com_

**To Seller at:**

_3216 Alabama Court_

_Houston Tx 77027_

Telephone: _713·622·1345_

Facsimile: _____

E-mail: ~~Don~~ _Holmes.Don1@gmail.com_

22. **AGREEMENT OF PARTIES:** This contract contains the entire agreement of the parties and cannot be changed except by their written agreement. Addenda which are a part of this contract are (check all applicable boxes):

☐ Third Party Financing Addendum for Credit Approval

☐ Seller Financing Addendum

☐ Addendum for Property Subject to Mandatory Membership in a Property Owners Association

☐ Buyer's Temporary Residential Lease

☐ Seller's Temporary Residential Lease

☐ Addendum for Reservation of Oil, Gas and Other Minerals

☐ Addendum for "Back-Up" Contract

☐ Addendum for Coastal Area Property

☐ Environmental Assessment, Threatened or Endangered Species and Wetlands Addendum

☐ Addendum for Property Located Seaward of the Gulf Intracoastal Waterway

☐ Addendum for Sale of Other Property by Buyer

☐ Other (list): _____

TAR 1607    Initialed for identification by Buyer _____ and Seller _____    TREC NO. 9-9

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.ziplogix.com

**23. TERMINATION OPTION:** For nominal consideration, the receipt of which is hereby acknowledged by Seller, and Buyer's agreement to pay Seller $ _____(Option Fee) within 2 days after the effective date of this contract, Seller grants Buyer the unrestricted right to terminate this contract by giving notice of termination to Seller within _____ days after the effective date of this contract (Option Period). If no dollar amount is stated as the Option Fee or if Buyer fails to pay the Option Fee to Seller within the time prescribed, this paragraph will not be a part of this contract and Buyer shall not have the unrestricted right to terminate this contract. If Buyer gives notice of termination within the time prescribed, the Option Fee will not be refunded; however, any earnest money will be refunded to Buyer. The Option Fee ☐ will ☐ will not be credited to the Sales Price at closing. **Time is of the essence for this paragraph and strict compliance with the time for performance is required.**

**24. CONSULT AN ATTORNEY:** TREC rules prohibit real estate licensees from giving legal advice. READ THIS CONTRACT CAREFULLY. If you do not understand the effect of this contract, consult an attorney BEFORE signing.

Buyer's Attorney is: _____     Seller's Attorney is: _____

_____     _____

Telephone: _____     Telephone: _____

Facsimile: _____     Facsimile: _____

E-mail: _____     E-mail: _____

EXECUTED the _____ day of _____, _____ (EFFECTIVE DATE).
(BROKER: FILL IN THE DATE OF FINAL ACCEPTANCE.)

Buyer _____     Seller _____

Buyer _____     Seller _____

The form of this contract has been approved by the Texas Real Estate Commission. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transactions. It is not intended for complex transactions. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, (512) 936-3000 (http://www.trec.texas.gov) TREC NO. 9-9. This form replaces TREC NO. 9-7.

## BROKER INFORMATION

Other Broker Firm                    License No.        Listing Broker Firm                    License No.

represents ☐ Buyer only as Buyer's agent               represents ☐ Seller and Buyer as an intermediary

☐ Seller as Listing Broker's subagent                  ☐ Seller only as Seller's agent

Licensed Supervisor of Associate     Telephone          Licensed Supervisor of Listing Associate  Telephone

Associate                            Telephone          Listing Associate                      Telephone

Other Broker's Address               Facsimile          Listing Broker's Office Address        Facsimile

City              State        Zip                      City                 State             Zip

Associate Email Address                                 Listing Associate's Email Address

                                                        Selling Associate                      Telephone

                                                        Selling Associate's Office Address     Facsimile

                                                        City                 State             Zip

                                                        Selling Associate's Email Address

Listing Broker has agreed to pay Other Broker _____ of the total sales price when the Listing Broker's fee is received. Escrow Agent is authorized and directed to pay Other Broker from Listing Broker's fee at closing.

## OPTION FEE RECEIPT

Receipt of $ _____ (Option Fee) in the form of _____ is acknowledged.

Seller or Listing Broker                                Date

## CONTRACT AND EARNEST MONEY RECEIPT

Receipt of ☐ Contract and ☐ $ _____ Earnest Money in the form of _____ is acknowledged.

Escrow Agent: _____        Date: _____

By: _____

                                                        Email Address _____

Address _____              Telephone: _____

City              State        Zip                      Facsimile: _____

TAR 1607